THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RONALD SMITH, Defendant-Appellant.

First District (1st Division)   No. 1—88—2613

Opinion filed June 29, 1992.

Randolph N. Stone, Public Defender, of Chicago (Alison Edwards, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kathleen Howlett, and Lisa Goldsand, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant Ronald Smith was found guilty of four counts of armed robbery and sentenced to 14 years of imprisonment, with three years of mandatory supervision upon release. Defendant also pleaded guilty to a charge of unlawful use of a firearm, for which he was sentenced to four years of imprisonment to be served concurrently with the armed robbery sentence. For the following reasons, we affirm.

The transcript of proceedings taken at the trial of this case indicates the following. Patrick Henson, a sales clerk at a 7-11 store in Riverside, testified that defendant entered the 7-11 at about 1 a.m. on December 7, 1985. Defendant asked to purchase beer. Henson replied that the local law prohibited him from selling beer after 11 p.m., but that the neighboring town of Lyons allowed the sale of beer until 4 a.m. Defendant commented that the local law was stupid and asked to buy cottage cheese. Henson assisted defendant in finding cottage cheese and potato chips. As defendant approached the sales counter, Henson noticed defendant had a limp. Henson did not notice anything else unusual about defendant.

After placing the goods on the counter, defendant produced a gun and demanded that Henson empty the cash register onto the counter, except for the change. Defendant then asked for Henson's own money. Henson also testified that defendant left the money on the counter for several minutes. Defendant told two other people in the store, who were friends of Henson, to go over by the automatic teller machine, where they could not be seen by people outside the store. Defendant then had Henson get him two six-packs of bottled Old Style beer, cartons of Kool cigarettes and five bottles of wine. Defendant asked for hard liquor.

Next, defendant stood behind a cigarette display, where he could not be seen, while a woman entered the store, bought a soda, then departed. Defendant began to drink from a bottle of beer. However, as more people entered the store, defendant would order them to empty their pockets and lie on the floor in the second aisle of the store, where they could not be seen from outside the store. Defendant told Henson to remain behind the counter to make it look like he was doing business as usual. At some point, defendant told Henson to

wave the police on if they should drive through the store's parking lot.

Henson further testified that defendant surprised between 15 and 20 customers in this manner in about 20 to 30 minutes. Defendant told Henson to open the store's safe or he would start shooting the customers at the count of five. Henson replied that he was unable to open the safe, which had a time lock. Defendant appeared frustrated, then asked if his gun would be able to shoot the safe open; Henson stated that he did not know.

At one point, defendant went to the customers on the floor and threw handfuls of candy to them; defendant stuck a lollipop in the mouth of one customer and stuffed crackers in the mouth of another. Defendant also asked one customer if he had any money. The customer replied that he did not, upon which defendant kicked him in the leg and asked him why he was in the store. Defendant then returned to the front of the store and ordered Henson to lie facedown on the floor; Henson complied. Defendant told everyone to remain where they were for five minutes and that defendant had a "buddy" who would watch them. Henson heard the door close, then heard it reopen and heard defendant tell everyone that they were doing a good job. Henson again heard the door close.

Henson also testified that he had previously identified defendant from a series of photographs provided by the police. Henson further identified defendant's gun and marked photographs of various places in the store mentioned in Henson's testimony.

James Durham testified that he and his friend, Eric Anderson, were in the 7-11 store on December 7, 1985, when defendant entered the store. Durham stated that defendant pulled a gun out from under his jacket on his way to the counter and told them that "This is a stick-up." Defendant asked Durham and Anderson if they had any money; they did not. Defendant then told Durham and Anderson to lie on the floor. Defendant then told them to get up while a woman entered and left the store. The two men were then told to lie on the floor again. Durham could hear parts of a conversation between Henson and defendant, including defendant telling Henson to open the safe or he would start "blowing away these people two by two." More people were ordered to lie on the floor. Defendant told the customers to remain on the floor after he left and told them that they did not know what he looked like. According to Durham, one customer then stated that defendant was a short, black man (the record indicates that defendant is a tall Caucasian). Defendant left, returned to tell everyone they were doing a good job and left again.

Frank Ruffolo testified that on December 7, 1985, he was the owner of a Rosati's Pizza restaurant located next to the 7-11 in Riverside. Ruffolo stated that he entered the 7-11 between 1 and 1:30 a.m. to get a cup of coffee after closing the restaurant. As Ruffolo passed by defendant on the way to the coffee machine, defendant pointed the gun at him, stating "Join the party, bro, get around the corner with the rest of them and empty your pockets." Ruffolo could see four people on the floor in the aisle. Before joining them, Ruffolo produced about $250 and two checks made out to Rosati's Pizza, which defendant took. Ruffolo characterized some of defendant's tone of voice as "witty." Defendant did not stumble in the store.

Ruffolo then stated that at least four more people were ordered into the aisle, including at least one woman and Ruffolo's father. Defendant did not take money from Ruffolo's father. Defendant shouted at the sales clerk to open the safe; some of the women in the aisle were screaming, crying and telling Henson to open it. Defendant threatened to shoot the customers two at a time.

Ruffolo further testified that he had noticed blood on defendant's pants leg. As defendant threatened to shoot the customers, defendant stated, "And if you think I'm kidding, I just got in a fight [with an Hispanic] [a]nd I shot him twice and he shot me once in the leg and I'm not kidding, open the safe." The record appears to indicate that defendant's leg wound was self-inflicted. Ruffolo also corroborated the sequence of defendant's departure.

Len Howard testified that he and Julie Dunn arrived at the 7-11 in Riverside shortly after 1 a.m. on December 7, 1985. As the two entered the store, Howard noticed the number of cars parked outside the seemingly empty store and asked the cashier, "Where's the party?" Defendant, pointing a gun at the pair, told them to give him their money and lie down in an aisle behind the candy rack. Howard noticed five or six people already lying on the floor. Howard referred to the conversation between Henson and defendant regarding the safe, as well as the sequence of defendant's departure. After two or three minutes, Howard got up, jumped over the counter and called the police. The police arrived a few minutes later.

Howard also testified to identifying defendant from police photographs and identified defendant's gun. Dunn testified to the same basic version of events as Howard.

Brenda Pauley testified that when she entered the 7-11 store at the time in question, defendant told her "to come over and join the rest of them." At first, Pauley proceeded to get a soda, thinking that defendant was just trying to "hassle" her. Defendant then pointed his

gun at Pauley and told her to get down on the floor with the others. Pauley told defendant there was no room; defendant told Pauley to find room. While Pauley characterized defendant's tone of voice as "casual" when she walked in, the tone became "higher, more demanding" during the discussion regarding the safe. Pauley further testified that when defendant told the customers that nobody knew what he looked like, one customer said, "All I heard of was you're short." Pauley testified that defendant is not short.

Riverside police officer Hoes testified that he and Officer Gordon, responding to a dispatch, arrived at the 7-11 at about 1:28 a.m. on December 7, 1985. Officer Hoes spoke to the persons in the store and obtained a description of the perpetrator. This description was relayed to Officer Gordon, who was searching the area around the store, and was then broadcast over the air. Officer Gordon found a bag containing cartons of Kool cigarettes and an open bottle of Old Style beer near the store.

Officer Markas of the Cicero police department testified that at about 1:35 a.m. on December 7, 1985, he observed defendant driving a gray Toyota left of the center lane on the 2500 block of Austin Avenue. Officer Markas curbed the vehicle about six blocks northeast at 57th Street. Officer Markas was backed up by Officer Serat, who was soon replaced by Officer Nudera. When Officer Markas asked defendant for his driver's license, defendant sped away. Officer Markas called in a chase; Officers Markas and Nudera curbed the Toyota at the intersection of Cermak and Central, where the car had spun out. Several other squad cars arrived on the scene.

Lieutenant Zalas testified that he had been in the area of Officer Markas' initial traffic stop when he observed the Toyota leaving the scene. Lieutenant Zalas had been the first car to reach the Toyota after it spun out at Cermak and Central. Lieutenant Zalas took control of the keys to the Toyota. Officers Markas and Nudera assisted Lieutenant Zalas in removing defendant from the Toyota. Lieutenant Zalas noticed the butt of a revolver sticking out of defendant's belt. Later examination showed this to be a .38 caliber revolver with two live cartridges and one spent shell. Officer Nudera transported defendant to the station. When Lieutenant Zalas noticed the bloodstain on defendant's pants at the station and discovered that defendant appeared to have suffered a bullet wound to the knee, defendant was taken to the nearest hospital.

Officer Nudera corroborated parts of the testimony of Officer Markas and Lieutenant Zalas. Officer Nudera also testified that the Toyota was taken to the station and inventoried. Officer Nudera dis-

covered beer cans and an open carton of Kool cigarettes in the car. Defendant was questioned at the station and seemed coherent at the time. Officer Nudera also had defendant empty his pockets; defendant removed $464 and two checks made payable to Rosati's Pizza.

Defendant proceeded, raising the defense theory of involuntary intoxication. Dr. James O'Donnell, a pharmacologist and pharmacist, testified as an expert. At the time of the trial, Dr. O'Donnell had been a teacher of physiology and pharmacology for about 12 years. He had also been a consultant to agencies such as the State Attorney General's office, the Department of Public Health, the Cook County State's Attorney's office, the Chicago police department and the Cook County public defender's office on subjects including alcohol dependency for about the same period of time.

Dr. O'Donnell stated that defendant had been a patient at the MacNeal Hospital Alcohol Treatment Center (MacNeal) from December 2 through 6, 1985. Dr. O'Donnell then testified that Valium is a minor tranquilizer which may be used in the treatment of alcohol dependency to prevent withdrawal symptoms and control seizures. Valium is given in high doses initially, when the alcohol is stopped, with the dosage being decreased gradually over a five- to seven-day period. A normal dosage of Valium for alcohol dependency treatment would be 10 to 20 milligrams four times a day. Valium has a long "half-life," which means that the drug's effects can linger for hours after the final dose.

Dr. O'Donnell then testified that he had reviewed defendant's medical records from MacNeal, which indicated that the dosage of Valium given to defendant had substantially increased, rather than decreased, from December 2 to December 6, 1985. In the 24 hours prior to defendant's elopement from the hospital, defendant had been given 155 milligrams of Valium. Dr. O'Donnell stated that the largest dose he had seen for detoxification was 80 to 90 milligrams per 24 hours; he had seen 105 to 110 milligrams given to prevent seizures.

Dr. O'Donnell further testified that 155 milligrams of Valium would have an intoxicating effect on a person. Such a dose could cause a "paradoxical reaction," meaning unexplained or unexpected reactions including rage, confusion, hyperexcitability, behavioral abnormalities and impaired cognitive and judgmental abilities. Dr. O'Donnell opined that defendant was involuntarily intoxicated at the time he left MacNeal. Defendant would have been drugged at the time of the offense and that condition would show up on a blood test.

On cross-examination, Dr. O'Donnell admitted that he did not know the legal definition of involuntary intoxication. The doctor did

not mean that defendant took the Valium against his will. The doctor did not know if, at the time of the offense, defendant could appreciate the criminality of his conduct or if defendant was unable to conform his conduct to the requirements of the law.

In rebuttal, the State called Dr. Glen Nelson, who treated defendant at MacNeal from December 2 through December 6, 1985. During his residency training at MacNeal, Dr. Nelson took three months of courses on alcohol and drug dependency treatment, including the use of Valium to treat alcoholism. Dr. Nelson later became assistant medical director of MacNeal's drug and alcohol treatment program from 1984 to 1987. He was also board certified by the American Medical Society on Alcoholism and Other Drug Dependencies in 1986. At the time of the trial, Dr. Nelson had treated between 800 and 1,000 cases of alcohol or drug dependency. On cross-examination, the court sustained the State's objection to defense inquiries about Dr. Nelson's technical knowledge of the effects of Valium. The doctor was deemed an expert by the trial court.

Dr. Nelson testified that defendant was never forced to take Valium while at MacNeal. Dr. Nelson had explained the medical effects of Valium to defendant both upon his admission and again the following day, because patients may be intoxicated upon their admission to MacNeal. Defendant did not respond to the Valium as Dr. Nelson had expected; the dosage was increased each day because defendant continued to have high blood pressure, tremors and restlessness. Dr. Nelson stated that there were three possible reasons for defendant's unresponsiveness to treatment: defendant could have been ingesting unprescribed stimulants; defendant may not have been ingesting all of the doses; or defendant's high tolerance to sedatives may have made him resistant. The record does not contain evidence regarding the first two possibilities; the trial court sustained the State's objection to cross-examination concerning Dr. Nelson's prior treatment of defendant as it might relate to a tolerance for sedatives.

Dr. Nelson further testified that he treated defendant on December 7, 1985, for the gunshot wound to defendant's knee. The doctor did not prescribe Valium at this time. A urine screening for drugs taken at the time was negative for Valium, which indicates that the urine contained less than one microgram per milliliter. MacNeal performs urine tests instead of blood tests because the former are quicker and detect more types of drugs. Defendant was transferred to Cook County Hospital later that same day. Based on the urine test results, Dr. Nelson opined that defendant would not have been under the influence of Valium at 1:30 a.m. on December 7, 1985. The trial

court sustained the State's objection to cross-examination of Dr. Nelson concerning the results of a blood test conducted at Cook County Hospital.

The State also called Dr. Albert Stipes, who was employed by the Cook County Psychiatric Institute and Loyola Medical School, as an expert witness. After interviewing defendant and reviewing medical records and the police reports, Dr. Stipes diagnosed defendant as having a "mixed substance dependency" and a "mixed personality disorder." Dr. Stipes also stated that the dosage of Valium given to defendant was not unusually high and that defendant's withdrawal symptoms continued despite these doses. Dr. Stipes opined that based on the medical and police reports, defendant was not involuntarily intoxicated at the time of the offense; defendant was able to appreciate the criminality of his conduct and conform his conduct to the requirements of the law.

On cross-examination, Dr. Stipes admitted that he had no experience in detoxifying a person with Valium. Nevertheless, Dr. Stipes stated that current practice is to start with a smaller dose of Valium and work upwards in order to determine the patient's tolerance for the drug. Dr. Stipes also agreed that an excessive dose of Valium could affect a person's judgment and behavior. Dr. Stipes also reviewed the blood test conducted at Cook County Hospital, which indicated a measurable amount of benzodiazapine, a component of minor tranquilizers including Valium. However, on redirect, Dr. Stipes noted that this could be attributable to drugs aside from Valium and that the amount measured would have had little effect on defendant.

After the close of evidence, the trial court sustained the State's objection to tendering an instruction on involuntary intoxication. The jury found defendant guilty of armed robbery; defendant later pleaded guilty to the charge of unlawful use of a weapon. Defendant now appeals.

## I

■ Defendant first argues that the trial court denied him due process of law by refusing to instruct the jury on the affirmative defense of involuntary intoxication set forth in section 6—3 of the Criminal Code of 1961, which provides in relevant part that:

"A person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition either:

\*\*\*

(b) Is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to

conform his conduct to the requirements of law." Ill. Rev. Stat. 1985, ch. 38, par. 6–3(b).

On appeal, defendant argues that a patient's unexpected intoxication resulting from medication prescribed and dispensed in a hospital is involuntarily produced. Defendant contends that his reasonable reliance on professional medical treatment renders him morally blameless for the offense at issue in this case. There do not appear to be any Illinois cases directly addressing the issue of whether intoxication of the type alleged here is "involuntarily produced" within the meaning of the statute.

■ However, we need not reach that issue in this case. Defendant is entitled to a jury instruction regarding an affirmative defense only when he has presented "slight" evidence on each element of that defense. (*People v. Wielgos* (1991), 142 Ill. 2d 133, 136, 568 N.E.2d 861, 862-63.) In this case, the record clearly demonstrates that defendant failed to present *any* evidence that his treatment deprived him of substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. Dr. O'Donnell, defendant's expert witness, testified on cross-examination that he did not know the legal definition of involuntary intoxication. Dr. O'Donnell also testified that he did not know if, at the time of the offense, defendant could appreciate the criminality of his conduct or if defendant was unable to conform his conduct to the requirements of the law. Thus, defendant presented no evidence on these elements of the defense. Nor could defendant have relied on evidence introduced by the State; according to Dr. Stipes, one of the State's experts, defendant was able to appreciate the criminality of his conduct and conform his conduct to the requirements of the law. In sum, defendant has failed to show from the record that he was entitled to a jury instruction on the defense of involuntary intoxication.

## II

■ Defendant's second contention on appeal is that the trial court erred in ruling that Drs. Nelson and Stipes were expert witnesses. Defendant argues that so ruling improperly bolstered Dr. Nelson's credibility because he was not an expert at the time he treated defendant. Defendant also argues that Dr. Stipes was not an expert in any field which would allow him to comment on whether defendant was involuntarily intoxicated.

Defendant is required to raise these issues by objection at trial and in his written post-trial motion to preserve the issue for appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130.)

Here, defendant failed to object to the court's determinations that Drs. Nelson and Stipes were experts in his written post-trial motion; thus, the arguments are waived.

## III

Defendant's third contention is that the trial court erred in refusing to allow cross-examination of Dr. Nelson on the issue of defendant's tolerance for Valium and on the blood test conducted at Cook County Hospital. Defendant argues that the record of Dr. Nelson's prior treatment of defendant does not support Dr. Nelson's opinion at trial that defendant had a high tolerance for Valium. Defendant also argues that the results of the blood test could have been used to impeach Dr. Nelson's opinion that defendant was not intoxicated at the time of the offense.

The record indicates that defendant failed to object to the rulings preventing cross-examination on defendant's tolerance for Valium. Nor did defendant make an offer of proof to the trial court in order to show what testimony defendant expected to elicit. Thus, the issue is waived on appeal. (*Enoch*, 122 Ill. 2d at 186, 522 N.E.2d at 1130; see also *People v. Cobb* (1989), 186 Ill. App. 3d 898, 905, 542 N.E.2d 1171, 1176 (offer of proof is not required unless testimony sought is obviously relevant and material).) Moreover, even if defendant had objected at trial, no amount of impeachment on the issue of defendant's tolerance would have changed the verdict in this case because there was no evidence that defendant's treatment deprived him of the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

## IV

Defendant next raises several allegations that he was denied effective assistance of counsel guaranteed by the sixth amendment to the United States Constitution. Typically, to prove ineffective assistance of counsel, defendant must prove both prongs of the test set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. (*People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246.) The requirements are that the errors must be so great that counsel is not acting as "counsel" as guaranteed by the sixth amendment and defendant was deprived of a fair trial as a result. (*Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) Counsel's competence is to be determined from the totality of counsel's conduct, not isolated incidents, and a reviewing court will not extend its inquiry into areas involving the exercise of judgment, discre-

tion, trial tactics or strategy. *People v. Thurman* (1988), 169 Ill. App. 3d 996, 1005, 523 N.E.2d 1184, 1190.

■ In this case, defendant primarily argues that the State's case was not subjected to meaningful adversarial testing, thus depriving him of the effective assistance of counsel guaranteed by the sixth amendment to the United States Constitution. (See *United States v. Cronic* (1984), 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039.) Defendant particularly relies upon *People v. Robinson* (1979), 70 Ill. App. 3d 24, 387 N.E.2d 1114, in which defense counsel argued the defense of dwelling in a murder case, despite the fact that the trial judge refused to instruct the jury on that defense.

*Robinson* is distinguishable. In that case, the court remarked that defendant's testimony indicated that he admitted shooting the victim, but was obviously relying on the justifiable use of force as a defense. (*Robinson*, 70 Ill. App. 3d at 27, 387 N.E.2d at 1116.) In this case, defendant has failed to show some defense other than involuntary intoxication was available to him. Moreover, the tone of the entire closing argument in *Robinson* was characterized as "offensive" by this court (*Robinson*, 70 Ill. App. 3d at 28, 387 N.E.2d at 1117); here there is no such claim.

Defendant also argues that he was denied effective assistance of counsel because denial of the defense instruction left defendant with an admission of guilt and no defense. (See *People v. Hattery* (1985), 109 Ill. 2d 449, 488 N.E.2d 513.) In *Hattery*, however, defense counsel told the jury that they would find the defendant guilty, supposedly as a strategic move to avoid the death penalty. Where defense counsel does not confess his client's guilt, *Hattery* will not compel a reversal. See *People v. Emerson* (1987), 122 Ill. 2d 411, 430, 522 N.E.2d 1109, 1116.

In this case, the record indicates that defense counsel continued to pursue the involuntary intoxication defense and attack the strength of the State's case during closing arguments, concluding that the jury would find defendant not guilty. Defendant has not pointed to any other course of action which could have been taken by his attorney. A decision to rely on one defense theory to the exclusion of others is generally a matter of trial tactics. (*People v. Gallardo* (1983), 112 Ill. App. 3d 764, 770, 445 N.E.2d 1213, 1218.) Defense counsel is not required by the sixth amendment to manufacture a defense which does not exist. (*People v. Holman* (1983), 115 Ill. App. 3d 60, 65, 450 N.E.2d 432, 435.) Thus, defense counsel's decision to argue the defense, despite the trial court's refusal to instruct the jury on it, was not ineffective assistance of counsel.

Defendant further argues that he was deprived of effective assistance of counsel when his attorney approved a plea agreement on the related offense of unlawful use of a weapon (UUW). In particular, defendant argues that he was not advised of his rights before entering his plea, as required by law. See 134 Ill. 2d R. 402; see also *Boykin v. Alabama* (1969), 395 U.S. 238, 23 L. Ed. 2d 274, 89 S. Ct. 1709 (to sustain a conviction, the record must indicate that the defendant's guilty plea was entered into knowingly and voluntarily).

The State does not dispute that defendant was not informed of his rights before entering the guilty plea. In this case, however, the plea served the strategic purpose of obtaining a concurrent, rather than consecutive, sentence. Unlike *Hattery*, upon which defendant relies, the defendant here was already found guilty of the armed robbery charge; thus, guilt on the related UUW charge may have been conceded to show that defendant was accepting responsibility for his acts and thereby obtain a concurrent sentence. Accordingly, defendant has failed to demonstrate that reversal is mandated in this case.

## V

■ Finally, defendant contends that his sentence is excessive because his acts were due in part to an adverse reaction to prescribed drugs. In sentencing a defendant, the trial court may consider the gravity and circumstances of the offense, as well as defendant's mental capacity, age, demeanor and credibility. (*E.g., People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882, 884.) Furthermore, the trial court must balance the objectives of protecting society and rehabilitating the defendant. (See *People v. Harris* (1989), 187 Ill. App. 3d 832, 844, 543 N.E.2d 859, 866.) Once struck, a reviewing court will hesitate to upset this balance, especially where the sentence falls within the statutory limitation. *People v. Lambrechts* (1977), 69 Ill. 2d 544, 559, 372 N.E.2d 641, 649.

The record in this case indicates that defendant was sentenced to 14 years' imprisonment, which is well within the statutory guidelines for a Class X felony such as armed robbery. (See Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(3).) The record further indicates that the trial court took defendant's substance abuse problem into account in noting defendant's need for rehabilitation. The record further indicates that the trial court took into account the seriousness of the offense and defendant's prior history of criminal activity, including several prior convictions. Given this record, defendant has failed to demonstrate that his sentence is excessive.

For the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

BUCKLEY, P.J., and MANNING, J., concur.