THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
OLAF E. OLSON, JR., Defendant-Appellant.

Second District    No. 79-650

Opinion filed May 12, 1981.

Mary Robinson and Manuel Serritos, both of State Appellate Defender's Office, of Elgin, for appellant.

John Maville, State's Attorney, of Belvidere (Phyllis J. Perko and Martin P. Moltz, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE LINDBERG delivered the opinion of the court:

Defendant, Olaf Olson, was convicted after a jury trial in Boone County of attempted murder, armed violence, reckless driving, attempting to elude an officer and two traffic offenses. He was sentenced to concurrent terms of 27 years for attempted murder, 10 years for armed violence, 3 months for reckless driving, 30 days for attempting to elude an officer and fined $100 for each of the two traffic offenses. From the convictions for armed violence and attempted murder, defendant appeals. Ill. Rev. Stat. 1977, ch. 38, pars. 8—4(a), 9—1(a), 33A—2.

At approximately 1 p.m. on March 27, 1979, defendant Olson was observed by Illinois State Trooper Ken Kaas sitting in an automobile parked along Genoa Road near Rockford in such a way as to partially block the entrance to the Northwest Tollway. Kaas approached the automobile and asked Olson to pull over to the shoulder. Olson, who was slumped toward the passenger side of the front seat, took one look at the trooper and accelerated the car, ran through a red light and proceeded northbound on Genoa Road. Kaas gave chase. He testified that the speed of defendant's car exceeded 80 miles per hour and that the vehicle often strayed into the southbound lanes forcing oncoming traffic to swerve in order to avoid collision. Defendant ran a stop sign in an effort to turn onto Route 20, and then continued eastbound on that road.

Defendant stopped his car on Route 20, and Kaas pulled up behind. Kaas observed a long-barreled gun extending from the window of defendant's car from which a shot was fired in his direction. Olson again fled with Kaas in close pursuit.

The chase ended when Olson's car swerved in front of Kaas' vehicle, crossed the westbound lanes and hit an embankment on the north side of the road. Kaas testified that Olson fired a shot from his car and the trooper returned the fire. Defendant got out of his car, took another shot in the direction of Kaas and then staggered toward the trooper with his gun extended. Kaas fired several rounds at Olson who finally fell to the ground. He was hospitalized at about 3 p.m. A blood test taken at the time of admittance to the hospital showed blood alcohol content of .34 percent.

Subsequent inspection of the car yielded a bottle of whiskey and several items which were later identified as belonging to Tim and Matilda Breitbach, whose trailer home near Galena, Illinois, had been robbed earlier on the same day. The Breitbachs testified that two men in a car fitting the description of that owned by defendant had come to their farm

about 9 o'clock on the morning of March 27 and had asked directions to the Galena Territories. Returning from work later in the evening, the Breitbachs discovered that their trailer had been ransacked and several things stolen, including a shotgun. There were bullet holes in the windshield, cab door and hood of a truck parked outside. Although no fingerprints were recovered, the shotgun retrieved from defendant Olson was identified as belonging to the Breitbachs, and a spent cartridge found near the truck was matched to the shotgun.

Donald Greenshaw, work release director for Boone County, testified that on March 27, 1979, Olson was employed at Barnes Auto Body Shop in Belvidere pursuant to a work release program, the conditions of which required that inmates such as Olson go directly from jail to work. They could go nowhere else without special permission. On March 27, 1979, no such permission had been given Olson.

A fellow employee at Barnes Auto Body Shop, Jack Cooper, testified that on the day of the incident defendant arrived at work at about 12:30 p.m. "pretty drunk." Olson asked Cooper whether he still had his job, then mumbled that he wanted to call his girlfriend. Because of his drunken condition, Olson was unable to dial the telephone number. Cooper placed the call and handed him the phone. Olson left shortly thereafter.

## I

Defendant's first contention on appeal is that the evidence of his intoxication precluded a finding that he had the requisite intent to sustain a charge of attempted murder or armed violence.

■■ Both of these crimes require a showing of specific intent (*People v. Trinkle* (1977), 68 Ill. 2d 198, 369 N.E.2d 888; Ill. Rev. Stat. 1979, ch. 38, par. 33A—2), and are therefore subject to the defense of intoxication. (*People v. Harkey* (1979), 69 Ill. App. 3d 94, 386 N.E.2d 1151; *People v. Remon* (1976), 40 Ill. App. 3d 337, 352 N.E.2d 374.) However, voluntary intoxication may negate the element of intent only when it is so extreme as to entirely suspend the defendant's power of reason, *i.e.*, his ability to act knowingly. *People v. Mikel* (1979), 73 Ill. App. 3d 21, 391 N.E.2d 550; *People v. Fleming* (1976), 42 Ill. App. 3d 1, 355 N.E.2d 345.

Defendant called two doctors to testify as to his state of mind at the time of the incident. The first, Dr. Carl Hamann, who had earlier been appointed by the court to determine Olson's competency to stand trial, stated that the American Medical Association standards on alcohol levels in the blood provide that an amount of .3 to .4 percent alcohol is "definitely sufficient to cause death * * * and .5 is almost invariably fatal." At .3 to .35 percent levels, the person "would usually be stuporous and would have difficulty comprehending what they saw or heard." Dr. Hamann

speculated that at the time of the incident two hours before the blood test was administered, Olson's blood alcohol level would have been in the neighborhood of .4 percent. However, even at the lower level of .34 percent recorded two hours later, a person's ability to distinguish right from wrong would be "seriously impaired" and his power to reason would be "practically" suspended. At .4 percent, the person would be "very near comatose, near coma in a very stuporous position, and extremely difficult to think and reason or have any mental functioning except reflex actions." Dr. Hamann emphasized that certain routine physical actions might still be performed by persons with this amount of alcohol in the blood, but that such actions would be more indicative of reflex than intent. This would account, he said, for a person's ability to drive a car (although not well), get to one's place of work, or even shoot a gun if threatened. Dr. Hamann stated that Olson had a history of fighting and a deep-seated belief that others imposed upon and took advantage of him. When asked whether these characteristics affected his ability to form an intent to do something, he replied that it would likely make his reaction automatic.

The second medical witness, Dr. J. G. Graybill, testified that with a blood alcohol level of .34 percent it was "highly questionable" whether a person could form a judgment as to what is right and wrong, and that such a person's power to reason would be limited to "impulsive action" which Dr. Graybill distinguished from reasoning ability or judgment. The following colloquy between defense counsel and Dr. Graybill ensued:

"Q. Would this person with this .34 percent of alcohol in his blood stream know what he was doing?

A. To some degree he might, but he might not know why he is doing it.

Q. Could he form any intent as to a physical act with the .34 percent alcohol in his blood stream?

A. To form an intent requires reasoning and it requires judgment.

I would think this man's reasoning and judgment would be so far impaired that he could not intend—form an intent to commit a certain act. He might commit an act, but I would think it would be more of an instinctive type of thing or fright reaction, or perhaps a reflex action.

There is some stimuli he has viewed as threatening to him.".

For its part, the State offered no medical testimony to refute that given by the two defense witnesses. Instead, the State argues that despite the evidence of blood alcohol levels, intent was shown by Olson's flight upon first seeing Officer Kaas, an act which it characterized as "a reasoned reaction from an individual who knew he was in trouble (because

his car was filled with stolen items) and who thought that a quick escape would constitute his best chance of avoiding an unpleasant encounter with the authorities." The State also points to defendant's ability to drive an automobile in excess of 80 miles per hour, and to shoot a weapon with such accuracy as to hit the grillwork of Officer Kaas' car as further evidence that defendant's intoxication was not so extreme as to entirely suspend his power of reason.

■■ Although we have been unable to find a case where the objective, medical evidence of intoxication was more compelling, neither are we aware of any legal threshold with respect to blood alcohol levels beyond which a presumption of suspended reason is said to arise. Despite considerable development in psychiatric research and changes in medical and legal attitudes toward alcoholism, the law with regard to the effect of voluntary intoxication upon criminal responsibility has shown little tendency to change or develop. (See Annot., 8 A.L.R.3d 1236 (1966).) Under present law, the focus of our inquiry cannot be limited to whether the defendant was intoxicated, but whether in light of all the evidence surrounding his actions Olson had the requisite mental state. (*People v. Huggy* (1974), 19 Ill. App. 3d 247, 311 N.E.2d 355.) A jury is not required to accept the conclusions of a psychiatrist with respect to this issue. (*People v. Goodwin* (1980), 83 Ill. App. 3d 203, 403 N.E.2d 1051.) Rather, the weight to be given any testimony relating to the mental state of the defendant is peculiarly within the province of the jury (*People v. Fleming* (1976), 42 Ill. App. 3d 1, 355 N.E.2d 345), and where the evidence admits of two inferences, a reviewing court will not substitute its judgment unless the jury's decision is inherently impossible or unreasonable. (*People v. Jones* (1978), 67 Ill. App. 3d 477, 384 N.E.2d 523.) Although the question is a close one, we hold that despite defendant's intoxication, there was other evidence sufficient for the jury to find that Olson's power of reason was not entirely suspended.

## II

Defendant next assigns as error the trial court's admission, over continuing objection, of evidence that Olson had earlier on the day of the incident committed a burglary near Galena, Illinois, and that he was on parole and work release at the time.

■■ Both parties recognize the general rule that evidence of other crimes is inadmissible to show criminal tendency or disposition, but will in proper circumstances be allowed for the purpose of demonstrating motive, intent, identity, absence of mistake, or *modus operandi*. (*People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.) They also acknowledge that even where such evidence is offered for a proper purpose, the court must balance its relevance against its tendency to inflame and prejudice

the jury. (*People v. Copeland* (1978), 66 Ill. App. 3d 556, 384 N.E.2d 391.) It is defendant's contention that the evidence here was neither offered for a proper purpose, nor was its relevance to the crimes for which Olson was being prosecuted nearly as great as the prejudice and hostility toward the defendant which its admission may have aroused in the jury. The State replies that the evidence was important to show motive, *i.e.*, to explain why the defendant responded as he did to his encounter with a policeman. The State would also justify this evidence in light of Olson's intoxication defense, in that it tends to show that his reaction to Officer Kaas was a reasoned act, in view of the burglary, work release and parole violations, rather than merely a reflexive response, as defendant contended.

■■ Particularly in view of Olson's vigorous intoxication defense, we agree with the State that the introduction of some evidence of other offenses to show motive was proper here. (*People v. Parker* (1976), 35 Ill. App. 3d 870, 343 N.E.2d 52.) The more important question, however, is whether too much evidence was admitted. Five of the 15 State's witnesses either described the shambles left by the robber of the Breitbach home or commented on the evidence found in and around the house. The Breitbachs themselves described to the jury in graphic detail how the house had been "torn apart," the refrigerator tipped over and many items stolen. Mr. Breitbach and Detective Don Trost both testified with regard to damage to a truck parked outside from shotgun blasts. In addition, two other State's witnesses testified that Olson was on parole and that he had violated the conditions of his work release on the day of the incident.

In sum, a substantial amount of evidence was introduced which tended to prove the commission of another crime and the violation of the conditions of defendant's parole and work release, despite the fact that defendant was then being tried for none of these offenses. The State has cited *People v. Witherspoon* (1963), 27 Ill. 2d 483, 190 N.E.2d 281, wherein our supreme court held that evidence of warrants issued for the arrest of a defendant for previous crimes was admissible to establish a motive for the subsequent killing of a police officer who had attempted to arrest the defendant. Yet, unlike *Witherspoon*, the State here was not content to introduce just the warrants but went so far as to prove, through the testimony of seven witnesses, all the details of the other alleged offenses. The putative purpose of all this evidence was merely to show motive. Yet, such cumulation of inflammatory evidence of other offenses on an issue which was only peripheral to the crimes for which defendant was being tried demonstrates an insensitivity by the trial court to the need of balancing the probative value of each piece of evidence against its potential prejudice to the defendant. (*People v. Reimnitz* (1979), 72 Ill. App. 3d 761, 391 N.E.2d 380.) At some point, the cumulation of evidence

here clearly became such as could "overpersuade the jurors and cause them to convict the defendant as an 'evil person' worthy of punishment rather than because he is guilty of the crime charged. [Citations.]" (*People v. Butler* (1978), 63 Ill. App. 3d 132, 139, 379 N.E.2d 703, 708.) We are therefore compelled to reverse and remand this case for a new trial in which the introduction and use of any evidence of other offenses will be more circumscribed.

Because of our disposition of the evidentiary issue, we need not address defendant's final contention that attempted murder is here a lesser included offense of armed violence.

Reversed and remanded.

SEIDENFELD, P. J., and VAN DEUSEN, J., concur.