610 So.2d 670 (1992)
David BOSWELL, Appellant,
v.
STATE of Florida, Appellee.
No. 91-1600.
District Court of Appeal of Florida, Fourth District.
December 16, 1992.
*671 Richard L. Jorandby, Public Defender, and Jeffrey L. Anderson, Asst. Public Defender, West Palm Beach, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Melynda L. Melear, Asst. Atty. Gen., West Palm Beach, for appellee.
DOWNEY, Judge.
Appellant was indicted for first degree murder and convicted by a jury of murder in the second degree. The trial court departed from the sentencing guidelines and sentenced him to life imprisonment.
Nine appellate points have been presented by appellant for reversal of the judgment of conviction and sentence. We have carefully studied each point and find no reversible error demonstrated in seven of them. However, two of the points involving the denial of requested jury instructions appear to involve serious error requiring reversal of the judgment appealed from.
At the behest of appellant's wife, Deputies Pleasant and Dickinson came to appellant's home to assist in having him committed for alcoholism under the Myers Act. The deputies were unsuccessful in getting appellant to come out of the house, so they had their dispatcher call the Boswell residence and ask him to come out. He agreed to do so, but failed to appear. Therefore, since they could see the barrel of a gun pointing out of a window toward the area where Deputy Dickinson was standing, Deputy Pleasant went to the rear of the house to enter it. As he was moving toward the back of the house, Pleasant heard a gunshot. Upon entering the house, he saw appellant holding a rifle pointing toward the front of the house. Pleasant struggled with appellant and finally subdued him in the back yard. Thereafter, he found Dickinson shot in the forehead, from which wound he ultimately died.
Deputy Pleasant testified at trial that, although he didn't smell alcohol, Boswell had bloodshot, watery eyes. He stated that Boswell was wearing eyeglasses; however, he told two other detectives that Boswell was not wearing glasses. Over objection, Pleasant testified that, in a later search, glasses were found.
Detective Thomas Turner testified that he interviewed Boswell shortly after the shooting and Boswell stated that "I was fired upon, that's why I fired back." The parties agree that during this statement appellant claimed to have fired in self defense. Boswell stated that he was on the couch sleeping when he heard a car pull up. He said he saw a sheriff's car but couldn't see that the man behind the car was a uniformed deputy. Boswell testified that this person said to him, "you are dead meat unless you lay it down." The deputy called upon him to surrender several times. Appellant replied that, unless the person would identify himself, "you will have to kill me first." The parties agree that appellant claimed that the deputy fired at him first. Boswell takes the position that he hallucinated the initial shot and that he believed that he was firing in self defense. Detective Turner, who took the taped statement, testified that he detected a very slight odor of alcohol on Boswell but that Boswell was not under the influence.
One emergency medical technician, who arrived after the shooting, testified that he *672 noticed a slight odor of alcohol on Boswell. Two other technicians testified that they didn't notice any odor. Boswell was "very calm" and didn't seem "entirely aware of what was going on." Another technician had testified in deposition that Boswell was dazed and lethargic.
Gina Pellettere, the nurse at the jail, testified that Boswell told her that he had taken Xanax, Prozac and a pint of liquor on the day of the shooting.
Dr. James Poupko testified for the defense as an expert in toxicology and pharmacology. He testified that significant liver damage (Boswell has cirrhosis of the liver) affects the liver's ability to eliminate or detoxify alcohol, Prozac and Xanax. Poupko opined that the Prozac and Xanax levels were into the toxic range and that the side effects can include paranoid reactions and hallucinations. Poupko also testified that there was no question that toxic levels of Xanax and Prozac were achieved and that the quantity of alcohol that Boswell drank was not critical to the doctor's opinion.
Dr. Poupko testified, regarding the effect of having cirrhosis of the liver while taking medication such as Prozac and Xanax, as follows:
A. In my opinion, as far as Prozac and Xanax is concerned that the levels were present in his system and in his blood were far above the therapeutic levels and they were already in to the toxic range.
* * * * * *
Q. Why is that [,] given that the amount of medications prescribed are generally within the recommended therapeutic level?
A. Well, that's because of the individual's liver disease because of the cirrhosis. And studies, as I pointed out, indicate that in cirrhosis of the liver that there is a decreased ability of the liver to eliminate those drugs and therefore they tend to accumulate and higher levels are achieved than in an individual that has a healthy liver.
Also, one has heard a situation where you have two drugs that being eliminated by the liver they are competing for each other. So you have another factor which will increase the blood levels of those drugs, that competition.
Q. When  what does alcohol intake do to that whole picture?
A. As I pointed out earlier, alcohol to a certain extent is dependent upon the same mechanism to a certain extent as Prozac and Xanax. So you have further competition for the same mechanism of detoxification.
Appellant's wife testified that appellant was drinking during the morning of the day of the shooting.
Dr. Berland, a forensic psychologist who testified for the defense, opined that Boswell is mentally ill. Test results showed paranoia and schizophrenia and that Boswell suffered from hallucinations. Berland testified that Boswell's statement of hearing a gunshot and hearing someone yell, "you're dead meat" is consistent with hallucinations. However, Berland could not rule out the possibility that Boswell was simply lying about hearing the deputy say "dead meat."
Dr. Keith Haynes testified as an expert in forensic psychiatry and opined that Boswell was suffering from a mental illness at the time of the shooting. Haynes testified that Boswell suffered from effects of alcohol ingestion, plus ingestion of several psychoactive substances  Xanax and Prozac. The record reflects that Boswell has had hallucinations and episodes of paranoia and Haynes testified that Boswell apparently was hallucinating that he heard a shot.
In contrast, the state introduced the testimony of Dr. David Bortnick, a clinical psychologist, who examined Boswell for a half hour in the jail. He testified that Boswell was not mentally disordered and was sane at the time of the offense. On cross-examination, Bortnick admitted that he did not know that Dr. Caperusso was treating Boswell for cirrhosis of the liver (which decreases the body's ability to excrete drugs). Dr. Bortnick was not aware of all of the medications that had been prescribed to Boswell in the past and was *673 amazed when he heard the quantity of them.
Another clinical psychologist, Dr. Reinfeld, testified for the state that he saw Boswell the day after the shooting and that there was no evidence of hallucinations or delusions.
In support of his contention that he was entitled to an instruction on the defense of involuntary intoxication, appellant argues:
There was evidence before the jury that on the day of the shooting Appellant had taken the prescribed medicines of Prozac and Xanax and that he appeared "very inebriated." However, evidence showed that Appellant had consumed very little alcohol. Appellant's inebriated state was due primarily to the taking of prescribed medications. Appellant sounded as if he was on a combination of drugs and alcohol. Dr. Caperusso had prescribed both Prozac and Xanax for Appellant's depression. The levels of Prozac and Xanax in Appellant were in the toxic range. Prozac and Xanax cause the same depression of brain functions as alcohol. There is a loss in ability to moderate one's intentional and more impulsive actions by the judgment part of the brain.
It appears to us that appellant's argument is sound. A party is entitled to have the jury instructed upon the law which is applicable to his theory of the case, if there is any competent evidence adduced that could support a verdict in his favor. As the court said in Dudley v. State, 405 So.2d 304, 305 (Fla. 4th DCA 1981):
If the defendant asserts a valid legal defense and there is evidence presented to support the defense then the trial court is obligated to instruct the jury as to such defense upon request by the defendant.
See also, Palmes v. State, 397 So.2d 648 (Fla. 1981). It does not suffice to say that there was a great deal of evidence to the contrary; that simply demonstrates that there was an issue regarding the voluntariness of the defendant's intoxication.
The same principle holds true regarding appellant's requested charge on the effect of hallucinations. Although appellant requested a standard jury instruction on insanity, which was given, the trial court denied his request for an instruction on insanity dealing with hallucinations and delusions. That instruction would have advised the jury that:
A person may be legally sane and yet, by reason of mental infirmity, have hallucinations or delusions which cause him to honestly believe to be fact things which are not true or real. The guilt of a person suffering from such hallucinations or delusions is to be determined just as though the hallucinations or delusions were actual facts. If the act of the defendant would have been lawful had the hallucinations or delusions been the actual facts, the defendant is not guilty of the crime.
Two compelling arguments are made in support of appellant's request for said instruction: 1) there was substantial competent evidence to support it; and 2) the instruction was approved by the Supreme Court of Florida in Cruse v. State, 588 So.2d 983 (Fla. 1992), wherein the trial court gave a general insanity instruction and the instruction as it pertains to hallucination.
The state presented a strong case for conviction. Nevertheless, appellant's theory of the case never received the court's imprimatur via an instruction to the jury. Thus, for instance, how could the jury know that they could find the defendant not guilty even though he was not insane as defined by law, if they found that by reason of mental infirmity he was suffering from hallucinations or delusions at the time of the shooting that caused him honestly to believe to be fact things that were not true or real?
In view of the foregoing, we reverse the judgment and sentence and remand the cause to the trial court for a new trial.
ANSTEAD and DELL, JJ., concur.