THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID
A. HARI, Defendant-Appellant.

Fourth District    No. 4—03—0130

Argued November 16, 2004.—Opinion filed January 5, 2005.

APPLETON, J., specially concurring.

Daniel D. Yuhas and Keleigh L. Biggins (argued), both of State Appellate Defender's Office, of Springfield, for appellant.

Tony Lee, State's Attorney, of Paxton (Norbert J. Goetten, Robert J. Biderman, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE TURNER delivered the opinion of the court:

In February 2002, the State charged defendant, David A. Hari, with single counts of first degree murder and attempt (first degree murder). In November 2002, a jury found defendant guilty. In January 2003, the trial court sentenced defendant to 48 years' imprisonment on the murder count and imposed a consecutive 25-year prison term on the attempt count.

On appeal, defendant argues (1) the trial court erred in refusing to instruct the jury on the defense of involuntary intoxication, (2) the State failed to correct false testimony of defendant's former cell mate and defendant was unable to cross-examine the cell mate about his

motive to lie, and (3) the State's rebuttal evidence deprived defendant of a fair trial. We affirm.

## I. BACKGROUND

In February 2002, the State charged defendant by information (later amended in September 2002) with the offense of first degree murder (720 ILCS 5/9—1(a)(1) (West 2002)), alleging he, without lawful justification and with the intent to kill or do great bodily harm to Jeff Thomas, shot Thomas causing his death. The State also charged defendant with attempt (first degree murder) (720 ILCS 5/8—4(a), 9—1(a)(1) (West 2002)), alleging he, with the intent to commit first degree murder, performed a substantial step toward the commission of that offense in that without lawful justification and with the intent to kill Lisa Hari, shot her with a .22-caliber weapon. Defendant pleaded not guilty.

In November 2002, defendant's jury trial commenced. Doug Livingston testified he lived across the street from Lisa. On February 10, 2002, he "heard a couple of gunshots go off" and observed a person lying in the middle of the road. He identified the man as Jeff Thomas, who was dressed in his "dress blues." Livingston then went to Lisa's house, and upon entering the foyer, he saw blood on the floor, the steps, and "on the side wall as you go up the steps." He then encountered Lisa and saw that she had been wounded.

Travis Brown, a police officer with the City of Paxton, testified he received a dispatch concerning a domestic disturbance between defendant and Lisa on January 12, 2002. On February 10, 2002, Officer Brown stated he received a dispatch of a shooting around 6 p.m. Upon arrival at the scene, he noticed a man in a Navy uniform lying on the ground in "a pool of blood." He then entered the residence and came upon Lisa, who "was not coherent enough to speak."

Randy Kinzinger, the police chief of the Village of Roberts, testified he waited across the street from the residence of defendant's mother, Carol Hari, at around 7 p.m. on the date of the shootings. At approximately 9 p.m., defendant arrived in his white truck, and Kinzinger arrested him. In Kinzinger's squad car on the way to the sheriff's office, defendant asked what this was all about. During this time, defendant did not stumble, stagger, or have difficulty walking. Kinzinger stated defendant's speech was normal and he did not slur, mumble, or have difficulty in conversing with him.

Lisa Hari testified she filed for divorce in January 2002 from her 13-year marriage to defendant. They had two children. During the latter part of 2001, Lisa became involved with Jeff Thomas. Jeff told his wife he was having an affair, and Lisa told defendant she wanted a

divorce. On January 12, 2002, Lisa and defendant had an argument, and he "restrained [her] and would not let [her] leave," so she called the police. Defendant moved out on January 13, 2002, and he took his belongings, including his rifle. A couple of weeks later, Lisa discovered a package of photographs was missing. The pictures included some of her in her nightgown and of her and Jeff. She later learned defendant had shown the pictures to Jeff's wife. Jeff moved in, and they changed the locks on the doors because she was "scared" of defendant. Besides Lisa and Jeff, the only others who had keys included her parents; her son, Zack; and her neighbor, Doreen Hendricks.

On February 10, 2002, Lisa had a telephone conversation with defendant concerning the boys' church activity that evening. She returned home between 4:30 and 5 p.m. She received a call from Jeff, and he stated he would arrive at the house around 6 p.m. She then returned a phone call to her brother but heard a noise in the basement that sounded "like when [defendant] would cock the gun." While still on the phone, Lisa went downstairs to check on the noise. She walked around the basement and saw defendant "coming out with a gun." She told her brother, "oh, my God, he is here." Defendant then "started firing," and she "ran to try to get away." She testified she next remembered waking up in the hospital with gunshot wounds to her head, arm, and upper hip.

Zack Hari, defendant's 12-year-old son, testified defendant drove him and his brother to church around 5 p.m. on February 10. He stated his dad had no trouble driving his truck or difficulty in talking with him. At the church, defendant gave him "a real tight hug, tighter than usual[,] and he left."

Dr. Violette Hnilica, a forensic pathologist, testified she performed an autopsy on Jeff Thomas. She described four gunshot wounds in the mid-right trunk, the left buttock, the left forearm, and near the neck with the bullet severing his carotid artery. She determined the cause of death to be from multiple gunshot wounds.

Tracy Parker testified he was incarcerated at the time of trial in the Ford County correctional center. He had convictions for aggravated battery (1992), burglary (1994 and 2000), and arson (1994). While serving a sentence on a federal charge of possession of firearms by a felon, Parker was charged with the offense of conspiracy to escape. He pleaded guilty in October 2002 and anticipated being sentenced in January 2003. Parker and defendant were cell mates in the Ford County jail for seven weeks. After a few weeks, defendant started talking about his case. He told Parker about the pictures of his wife taken by Jeff and was "pretty mad about it." Defendant then got his .22-caliber rifle out of a gun cabinet and hid it in a basement utility room.

On the weekend of the shooting, defendant told Parker, he went over to the house and waited for Lisa and Jeff to come home. Defendant told him he borrowed a key from the neighbor and made a copy of it to get in. Defendant stated he shot Jeff and then shot Lisa.

On cross-examination, Parker stated he pleaded guilty to the conspiracy-to-escape charge and less than two days later approached the correctional authorities regarding information about defendant's case. Parker stated he could not receive a downward departure from his federal sentence because defendant's trial was a state case. Parker testified it could not "help [him] in either way." He had no expectation of receiving anything for his appearance at the trial.

Doreen Hendricks testified she lived next door to the Haris' house. In January 2002, Lisa had the locks changed on her house and gave a spare key to Hendricks, which she kept on the television in the living room. Later, Zack came to her house and asked to use the spare key to retrieve some homework from his house. He then returned the key. After that incident and before the shooting, defendant went to Hendricks's house to visit. She went to the kitchen to make coffee, and they talked at the table. Defendant left and returned "about an hour" later. He apologized to her and opened his hand, revealing the spare key to Lisa's house.

The defense called Gerald Gerrard as a witness. He became acquainted with defendant as the foreman of the lumberyard where defendant worked. After defendant's separation, Gerrard stated he "didn't seem like himself." John Zander, the manager of the lumberyard, testified defendant "was kind of down" and tired after his separation.

Carol Hari, defendant's mother, testified defendant came to live with her in early January 2002. Over time, defendant "became silent," did not sleep well, and lost 17 pounds. On February 10, 2002, defendant complained of a stomachache and took some over-the-counter medication. She also observed defendant taking the prescribed drug Zoloft. After he started taking the Zoloft, he was "restless," "tired," and "more depressed." She testified her son's depression "was worsening."

Dr. Robert Mitrione, a psychiatrist, testified he conducted an examination of defendant and reviewed available medical records. He stated Dr. David Hagan determined defendant suffered from depression in February 2002 and prescribed the antidepressant Zoloft. Dr. Mitrione stated Zoloft belongs to a class of drugs known as selective serotonin reuptake inhibitors. Serotonin cells have been associated with increased violence, hostility, depression, and worry. Zoloft is a chemical used to increase serotonin with the purpose of lessening the

potential for violence. Dr. Mitrione testified adverse reactions occur most frequently when the medication is first taken or when the dosage has been changed. Defendant had been on Zoloft for six days on February 10, 2002. Dr. Mitrione stated medical literature has reported acts of violence and suicide at the same stage of Zoloft intake.

Citing the Diagnostic and Statistical Manual IV, Dr. Mitrione stated the symptoms and observations made by Dr. Hagan were consistent with the diagnosis of major depression. In looking at the Physician's Desk Reference and a Zoloft package insert, Dr. Mitrione determined defendant suffered from side effects on February 10, 2002, including agitation, abdominal discomfort, fatigue, somnolence, confusion, malaise, and depression among other things. He also stated defendant was taking Tylenol PM to help him sleep. Dr. Mitrione testified defendant displayed symptoms of akathisia, a movement disorder that is "like an itch that can't be scratched." He opined defendant experienced jaw clinching and tremulousness after consuming the Zoloft and the Tylenol PM.

Based on his entire investigation, Dr. Mitrione diagnosed defendant with major depression, alcohol dependence, history of cannabis dependence and adverse reaction, taking on an involuntary basis a combination of Benedryl and Zoloft, and a probable paranoid-personality disorder. He stated involuntary Zoloft intoxication means a "toxic reaction" and a person suffering from it would not stagger, have slurred speech or demonstrate an inability to walk a straight line. Based on defendant's major depression, Dr. Mitrione opined defendant lacked substantial capacity to conform his behavior to appreciate the criminality of his act as a result of the involuntary Zoloft intoxication and his drug condition. On cross-examination, Dr. Mitrione stated he was not certain whether it was the Zoloft or the Benedryl or some combination thereof that caused the involuntary intoxication.

Defendant exercised his constitutional right not to testify. See U.S. Const., amend. V. In its rebuttal, the State called Dr. Hagan, defendant's family physician. On February 4, 2002, defendant indicated his concern about possible depression, lack of sleep, increased alcohol use, and poor concentration at work. Dr. Hagan found defendant was under "significant stress" and prescribed Zoloft. He stated the "PM" part of Tylenol PM is the diphenhydramine "but its trade name is Benedryl." In his experience, Dr. Hagan had not come across Zoloft being connected with involuntary intoxication.

Dr. Robert Chapman, a psychiatrist, testified he examined defendant on March 27, 2002, per court order and counsel's letter asking for an evaluation regarding the issue of sanity. In his mental-status examination, Dr. Chapman diagnosed defendant with personal-

ity disorder, depressed mood, and social-anxiety disorder. Dr. Chapman opined that on February 10, 2002, defendant was not impaired by any mental disease, defect, or other condition to cause him to lack substantial capacity to appreciate the criminality of his conduct. He stated he had not "formed an opinion regarding his capacity to conform his conduct" to the law because he was asked to do the examination "to fit the Illinois statute for insanity." Although not included in his report, Dr. Chapman stated "there was no mental disease or defect that caused [defendant] to lack substantial capacity to appreciate the criminality of his conduct or to conform his conduct *** to the requirements of the law." Dr. Chapman testified defendant's actions on the day of the shootings, witness statements, and his interview with defendant revealed evidence that was "not consistent with any toxic reaction to any medicines or any other substance."

During the jury-instruction conference, defense counsel sought to submit an instruction regarding involuntary intoxication. The trial court denied the requested instruction. Following closing arguments, the jury found defendant guilty of first degree murder and attempt (first degree murder).

In December 2002, defendant filed a motion for judgment of acquittal or for a new trial, which the trial court denied in January 2003. The court sentenced defendant to 48 years in prison on the murder count and a consecutive term of 25 years on the attempt (first degree murder) count. In February 2003, defendant filed a motion to reconsider, which the court denied. This appeal followed.

## II. ANALYSIS

### A. Jury Instructions

Defendant argues the trial court erred in refusing to instruct the jury on his defense of involuntary intoxication. We agree, but we find the error harmless.

"A defendant is entitled to an instruction on his theory of the case if some foundation exists for the instruction in the evidence." *People v. Probst*, 344 Ill. App. 3d 378, 385, 800 N.E.2d 834, 842 (2003). If some basis in the evidence for such an instruction exists, a trial court abuses its discretion in refusing to give the instruction. *People v. Kirchner*, 194 Ill. 2d 502, 556, 743 N.E.2d 94, 122 (2000).

In the case *sub judice*, Dr. Mitrione, based on a reasonable degree of medical and psychiatric certainty, opined defendant suffered from involuntary Zoloft intoxication, causing him to lack substantial capacity to appreciate the criminality of his acts and to conform his conduct to the requirements of the law. Defense counsel submitted jury instructions on involuntary intoxication. The trial court found the issue of

intoxication was raised by defendant's evidence and by Dr. Mitrione's testimony. However, the court refused to give the instruction based on the law in Illinois; that being, the intoxication must be caused by fraud, trickery, or deceit to be involuntary.

■ Section 6—3 of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/6—3 (West 2002)) states: "A person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."

In looking at involuntary intoxication, our supreme court has stated the General Assembly "was contemplating intoxication induced by some external influence such as trick, artifice[,] or force." *People v. Rogers*, 123 Ill. 2d 487, 508, 528 N.E.2d 667, 677 (1988), citing *People v. Downey*, 162 Ill. App. 3d 322, 515 N.E.2d 362 (1987), *People v. Larry*, 144 Ill. App. 3d 669, 494 N.E.2d 1212 (1986), and *People v. Walker*, 33 Ill. App. 3d 681, 338 N.E.2d 449 (1975). "The term 'involuntarily produced' in the context of section 6—3[ ] has been interpreted to refer to the mechanical act of ingesting the drug, not to the willing and intelligent assumption of the possible harmful consequences of taking the drug." *Downey*, 162 Ill. App. 3d at 335, 515 N.E.2d at 370. "Ignorance can be a source of involuntariness only if it is a result of trickery, fraud, or deceit." *People v. Gerrior*, 155 Ill. App. 3d 949, 953, 508 N.E.2d 1119, 1122 (1987).

Notwithstanding the previous case law, defendant argues intoxication caused by an unexpected adverse reaction to medication prescribed by a physician falls within the ordinary meaning of the term "involuntarily produced." The First District has stated there do not appear to be any Illinois cases addressing the issue of whether alleged intoxication resulting from prescription medication is " 'involuntarily produced' " within the meaning of the statute. *People v. Smith*, 231 Ill. App. 3d 584, 593, 596 N.E.2d 669, 675 (1992). As this matter is a case of first impression, we must determine whether evidence of an adverse reaction to lawfully prescribed medication amounts to a condition that is "involuntarily produced" thereby requiring an instruction to be given to the jury.

Statutory construction is a matter of law, and our review of the issue is *de novo*. *People v. Slover*, 323 Ill. App. 3d 620, 623, 753 N.E.2d 554, 557 (2001). The cardinal rule of statutory construction is to ascertain and give effect to the legislative intent. *Krohe v. City of Bloomington*, 329 Ill. App. 3d 1133, 1135, 769 N.E.2d 551, 553 (2002). When the statutory language is clear and unambiguous, it will be given effect without resort to the other tools of statutory construction.

*Segers v. Industrial Comm'n,* 191 Ill. 2d 421, 431, 732 N.E.2d 488, 494 (2000). However, when the language is ambiguous, courts may resort to extrinsic aids of statutory construction. *Allstate Insurance Co. v. Menards, Inc.,* 202 Ill. 2d 586, 591, 782 N.E.2d 258, 261 (2002). Here, the term "involuntarily produced" is not defined by the Criminal Code, nor does section 6—3 refer to fraud, trickery, or deceit. Thus, we will look to extrinsic aids of statutory construction to determine whether the term encompasses the issue presented before us.

> "The practice of relieving one of criminal responsibility for offenses committed while in a state of involuntary intoxication extends back to the earliest days of the common law. Involuntary intoxication, it appears, was first recognized as that caused by the unskillfulness of a physician or by the contrivance of one's enemies." P. Hassman, Annotation, *When Intoxication Deemed Involuntary so as to Constitute a Defense to Criminal Charge,* 73 A.L.R.3d 195(2)(a), at 199-200 (1976).

In terms of intoxication by prescription medication, a patient is entitled to assume a physician would not prescribe an intoxicating dose. *Perkins v. United States,* 228 F. 408, 415 (4th Cir. 1915). "Intoxication is considered involuntary if it is a product of *innocent* mistake, duress, or medical prescription." (Emphasis in original.) 2 J. Decker, Illinois Criminal Law § 18.23 (3d ed. 2000); see also W. LaFave & A. Scott, Criminal Law § 4.10, at 394 (2d ed. 1986) (intoxication can be characterized as involuntary when the substance was taken pursuant to medical advice).

> "It has been said that because a patient is entitled to assume that an intoxicating dose would not be prescribed or administered by a physician, where intoxication results from medicine which has been prescribed (and taken as prescribed) or administered by a physician, such intoxication is generally considered involuntary." 73 A.L.R.3d 195(7)(b), at 216.

Other jurisdictions have recognized involuntary intoxication resulting from the proper use of prescribed medication as a defense to criminal charges. See *State v. McKeon,* 201 Ariz. 571, 575, 38 P.3d 1236, 1240 (Ariz. Ct. App. 2002) (state law did not preclude the assertion of temporary intoxication resulting from the nonabusive use of prescription medication); *Commonwealth v. Darch,* 54 Mass. App. Ct. 713, 715, 767 N.E.2d 1096, 1098 (2002) (defense of involuntary intoxication available when the defendant suffers intoxicating effects from prescription medication taken as instructed); *Mendenhall v. State,* 15 S.W.3d 560, 565-66 (Tex. Crim. App. 2000) (intoxication by prescription medication has been identified as a form of involuntary intoxication); *State v. Gardner,* 230 Wis. 2d 32, 40, 601 N.W.2d 670,

674 (1999) ("the effects of prescription medication can form the basis of an involuntary[-]intoxication defense"); *Brancaccio v. State*, 698 So. 2d 597, 600 (Fla. Dist. Ct. App. 1997) (murder defendant who presented evidence of intoxication based on use of Zoloft was entitled to a jury instruction on his involuntary-intoxication defense); *Boswell v. State*, 610 So. 2d 670, 673 (Fla. Dist. Ct. App. 1992) (the defendant was entitled to an instruction on the defense of involuntary intoxication based on evidence he had taken the prescribed medicines Prozac and Xanax); *People v. Caulley*, 197 Mich. App. 177, 188, 494 N.W.2d 853, 859 (1992) (involuntary intoxication can be caused by the use of prescription medication); *People v. Turner*, 680 P.2d 1290, 1293 (Colo. Ct. App. 1983) (conviction reversed based on trial court's failure to instruct jury on involuntary intoxication after the defendant presented evidence of intoxication by prescription medication and he was not warned of intoxicating effect); *Shurbet v. State*, 652 S.W.2d 425, 428 (Tex. Crim. App. 1982) (involuntary-intoxication defense applies to evidence of medically prescribed drugs taken according to prescription); *City of Minneapolis v. Altimus*, 306 Minn. 462, 472, 238 N.W.2d 851, 858 (1976) (instruction on involuntary-intoxication defense was necessary based on the defendant's evidence that he was intoxicated and unaware of what he was doing based on unexpected reaction to prescription drug Valium); *State v. Gilcrist*, 15 Wash. App. 892, 894, 552 P.2d 690, 692 (1976) (intoxication resulting from medication prescribed by a physician deemed involuntary).

In contrast to these jurisdictions, the Illinois cases dealing with involuntary intoxication do not present the same factual scenario of a defendant ingesting a prescribed medication alone and becoming intoxicated. See *Downey*, 162 Ill. App. 3d at 335, 515 N.E.2d at 370 (trial court excluded defense of involuntary intoxication based on his purported addiction to cocaine); *Gerrior*, 155 Ill. App. 3d at 953, 508 N.E.2d at 1122 (trial court properly refused jury instruction on involuntary intoxication when the defendant took legally prescribed drugs and knew of the potential extreme reaction if taken with alcohol); *Larry*, 144 Ill. App. 3d at 679, 494 N.E.2d at 1219 (trial court refused instructions on involuntary intoxication based on evidence the defendant knowingly smoked adulterated marijuana); *Walker*, 33 Ill. App. 3d at 687-88, 338 N.E.2d at 453-54 (the defendant was not entitled to an instruction on involuntary intoxication where he ingested his brother's pills containing Seconal and mixed them with alcohol).

Merriam-Webster's Collegiate Dictionary defines "involuntarily" as "not subject to control of the will." Merriam-Webster's Collegiate Dictionary 616 (10th ed. 2000). It is rational to conclude that when a

person ingests a prescription drug and takes it as prescribed, an adverse reaction can be deemed to have been involuntarily produced. Considering like cases from foreign jurisdictions, we therefore hold that intoxication caused by an unexpected adverse reaction to prescribed medication falls within the ordinary meaning of the term "involuntarily produced." When evidence is presented showing a defendant ingested prescribed medication and suffered an adverse reaction whereby he was unable to control his own will when he committed a criminal act, a defendant is entitled to a jury instruction on the defense of involuntary intoxication.

■ Although we find the trial court erred in not instructing the jury on involuntary intoxication, reversal of defendant's convictions is not required. See *McKeon*, 201 Ariz. at 577, 38 P.3d at 1242 (trial court's failure to give involuntary-intoxication instruction was harmless beyond a reasonable doubt). "An error in a jury instruction is harmless if it is demonstrated that the result of the trial would not have been different had the jury been properly instructed." *People v. Pomykala*, 203 Ill. 2d 198, 210, 784 N.E.2d 784, 791 (2003). In determining whether the instruction error was harmless, a reviewing court must determine whether "evidence of [the] defendant's guilt was so clear and convincing as to render the error harmless beyond a reasonable doubt." *People v. Dennis*, 181 Ill. 2d 87, 96, 692 N.E.2d 325, 330 (1998).

When a defendant raises an affirmative defense other than insanity, "the State must sustain the burden of proving the defendant guilty beyond a reasonable doubt as to that issue together with all the other elements of the offense." 720 ILCS 5/3—2(b) (West 2002); see also *People v. Jeffries*, 164 Ill. 2d 104, 127, 646 N.E.2d 587, 597 (1995); *People v. Washington*, 326 Ill. App. 3d 1089, 1092-93, 762 N.E.2d 698, 700 (2002) (once the defendant presents sufficient evidence to establish an affirmative defense, the burden shifts to the State to disprove the affirmative defense beyond a reasonable doubt). Therefore, when the defendant sufficiently raises the defense of involuntary intoxication, the State has the burden of proof beyond a reasonable doubt as to the issue of defendant's mental state.

As noted earlier, a person in an intoxicated condition is criminally responsible for his conduct, "unless such condition is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." 720 ILCS 5/6—3 (West 2002). "Thus, the State was required to show beyond a reasonable doubt that the existence of the mental state for the offense was not negated by [the] defendant's intoxication or drugged condition." *People v. Leger*, 149 Ill. 2d 355,

387, 597 N.E.2d 586, 600 (1992). "Whether [the] defendant's intoxication was so extreme as to render him incapable of committing a knowing or intentional act is a question for the trier of fact." *People v. Redmond*, 265 Ill. App. 3d 292, 302, 637 N.E.2d 526, 534 (1994).

With the burden of proof in mind, we find the State's evidence rebutted defendant's involuntary-Zoloft-intoxication defense and therefore proved beyond a reasonable doubt that he possessed the requisite mental states for first degree murder and attempt (first degree murder). Defendant did present the testimony of Dr. Mitrione, who opined defendant lacked substantial capacity to conform his behavior to appreciate the criminality of his acts as a result of the involuntary Zoloft intoxication and his drug condition.

> " 'A jury is not required to accept the conclusions of a psychiatrist with respect to this issue [of an intoxication defense]. [Citation.] Rather, the weight to be given any testimony relating to the mental state of the defendant is peculiarly within the province of the jury [citation], and where the evidence admits of two inferences, a reviewing court will not substitute its judgment unless the jury's decision is inherently impossible or unreasonable.' " *Leger*, 149 Ill. 2d at 388, 597 N.E.2d at 600, quoting *People v. Olson*, 96 Ill. App. 3d 193, 197, 420 N.E.2d 1161, 1164 (1981).

The evidence in this case supported two contrary inferences regarding defendant's alleged involuntary intoxication. Defendant's expert testified defendant lacked the substantial capacity to conform his behavior to appreciate the criminality of his conduct. However, the State's evidence showed defendant was able to hide in the basement with his hidden rifle, wait for the victims to return home, shoot Lisa three times and Jeff four times including once in the back from a distance of 70 feet, return the children's duffel bags to the neighbor's garage, dispose of the murder weapon under a bridge after the shootings, and converse in a normal fashion with Chief Kinzinger following his arrest.

Our review of the record indicates the State presented clear and convincing evidence for the jury to convict defendant of the crimes charged. The jury heard the testimony that defendant was acting lucidly and normally prior to and after the shootings. The jury was not required to accept Dr. Mitrione's opinion (see *Redmond*, 265 Ill. App. 3d at 303, 637 N.E.2d at 535) and could reasonably reject this testimony in light of the totality of the State's evidence. It was within the province of the jury to believe the State's witnesses that defendant's condition did not negate the requisite mental state. Based on the record, we conclude defendant's guilt was so clear and convincing as to render any error in failing to instruct the jury on involuntary intoxication harmless beyond a reasonable doubt.

## B. Tracy Parker's Testimony

### 1. *False Representation*

Defendant argues his convictions must be reversed because the State failed to correct Tracy Parker's testimony that he had nothing to gain from his testimony. We find the issue forfeited.

Our supreme court has held that for an issue to be preserved for review on appeal, a defendant must offer an objection at trial and include that issue in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (1988); see also *People v. Durgan*, 346 Ill. App. 3d 1121, 1137, 806 N.E.2d 1233, 1245 (2004) (the defendant's failure to raise a timely objection at trial and in a posttrial motion forfeits issue on appeal).

In this case, defendant did not offer an objection at trial and failed to include the issue of the alleged failure to correct perjured testimony in his written posttrial motion. Thus, he has forfeited this issue on appeal.

### 2. *Cross-Examination*

Defendant argues the trial court denied him his constitutional right to cross-examine Parker about his motive to lie. We disagree.

In both the federal and state constitutions, a criminal defendant has the right to be confronted with the witnesses against him. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. A defendant's constitutional right to confrontation includes the right to cross-examine the State's witnesses. *Douglas v. Alabama*, 380 U.S. 415, 418, 13 L. Ed. 2d 934, 937, 85 S. Ct. 1074, 1076 (1965). "Any permissible matter which affects the witness's credibility may be developed on cross-examination." *People v. Kliner*, 185 Ill. 2d 81, 130, 705 N.E.2d 850, 876 (1998). For example, "a defendant has the right to inquire into a witness'[s] bias, interest[,] or motive to testify falsely." *People v. Davis*, 185 Ill. 2d 317, 337, 706 N.E.2d 473, 482 (1998).

■ Defendant claims the trial court restricted his ability to question Parker on the possibility of receiving good-conduct credit. Defense counsel objected at trial and raised the issue in the posttrial motion.

> "When determining whether a denial of cross-examination violates the defendant's right of confrontation, we should look not to what [the] defendant has been prohibited from doing, but to what he has been allowed to do. [Citation.] The issue under the confrontation clause is whether the jury has been made aware of adequate factors to determine whether the witness is worthy of belief, not whether any particular limitation has been placed on [the] defendant's ability to cross-examine a witness or whether the jury has knowledge of any specific fact. [Citation.] If the entire record shows that the

jury has been aware of adequate factors concerning relevant areas of impeachment of a witness, no constitutional question arises merely because the defendant has been prohibited on cross-examination from pursuing other areas of inquiry." *People v. Sykes*, 341 Ill. App. 3d 950, 978, 793 N.E.2d 816, 841 (2003).

In looking at Parker's entire cross-examination, defense counsel asked Parker about his federal conspiracy charge and how he confronted correctional officials about defendant's case shortly after he pleaded guilty. Defense counsel cross-examined Parker on his conversations with defendant about the shootings, his statement to the police, and his understanding that defendant shot Jeff first in the head and then shot his wife after that. Defense counsel questioned Parker about the cell he and defendant shared and the freedom of movement they had on the cellblock. Parker agreed he could have had access to the discovery materials but he did not look at them.

Defendant claims the trial court struck all of Parker's testimony pertaining to good-conduct credit. Our reading of the transcript differs. Defense counsel stated he wanted to ask Parker about what he expected to receive by way of consideration from correctional authorities on his current charges. The court stated defense counsel was entitled to show that Parker was "promised something." Further, the court stated if Parker believed he was going to get a benefit, "which is different than the traditional one, which is good time after he is sentenced, I think you can ask that." Further, the court stated counsel could "show that [Parker] knows he can benefit good[-]time[ ]wise after sentence for this. You can ask that." The court, however, stated counsel could not "go into the details of the length of time."

Defense counsel went on to ask Parker about his 10-year sentence and another 150-month period of time, but the trial court reserved objection on the question. The court ordered the jury disregard the question pertaining to Parker's term ending in 2012. After further questions were put to Parker on cross-examination, the following exchange occurred:

"MR. LANTO [(defense counsel)]: On the State charges[,] you said there was good time. Could you get on the State charges that are pending and that you are going to serve; is that right?

[MR. PARKER]: My State and [f]ederal times run concurrent.

[MR. LANTO]: But you can get good time on the State charges, likewise; can't you?

[MR. PARKER]: The same as everybody else, yes.

[MR. LANTO]: Uh-huh. So if you cooperate and if you behave, you can expect a reduction in [your] State charges or [your] State sentence?

[MR. PARKER]: I don't know about a reduction. Everybody does

a certain amount of time, if you don't get in trouble while you are in prison.

[MR. LANTO]: That's my point. That's correct?

[MR. PARKER]: Exactly.

[MR. LANTO]: Okay. No further questions, Judge.

THE COURT: Okay. Then I am going to rule on my reserved objections, and I am directing the jury to disregard the questions and answers about the 10 years and 150 months and their connection to whether or not he can obtain good time for testifying in this case. That's all stricken. You are ordered to disregard it."

We find the trial court's admonition dealt with the objections it had reserved ruling on earlier in Parker's testimony. The State did not object to the final questions pertaining to the possibility of good time Parker might receive. The court's order to disregard previous testimony points toward the length of Parker's sentence that the court had instructed defense counsel on earlier.

Even if defendant is correct that the trial court erroneously disallowed the witness's "subjective hopes of restoration of good-time credits or other leniency" (*People v. Harris*, 123 Ill. 2d 113, 148, 526 N.E.2d 335, 350 (1988)), our review of Parker's cross-examination testimony leads us to conclude defense counsel was given adequate latitude to establish Parker's alleged bias. As noted earlier, defense counsel cross-examined Parker on multiple areas of potential bias and opportunity to fabricate. Defendant's claims that Parker's character was "unimpeachable" and his "truthfulness was guaranteed" are without merit. Additionally, defense counsel argued in his closing statement that Parker would get a reduction in his sentence because of his cooperation. The jury had more than sufficient evidence to determine Parker's credibility and whether his testimony was motivated by selfish desires. Thus, we find any error by the court in limiting defense counsel's questions to Parker was harmless beyond a reasonable doubt. See *Harris*, 123 Ill. 2d at 148, 526 N.E.2d at 350.

## C. Dr. Chapman's Rebuttal Testimony

Defendant argues the State's attempt to elicit prosecution-friendly opinion testimony on intoxication from Dr. Chapman confused the jury and deprived him of a fair trial because Dr. Chapman only examined him on the issue of sanity. We disagree.

During its case in rebuttal, the State asked Dr. Chapman, over defense counsel's objection, if he had an opinion as to whether defendant had the substantial capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law at the time of the offense. Dr. Chapman stated defendant was not impaired by any mental disease or defect that would cause him to lack

substantial capacity to appreciate the criminality of his conduct. He continued, in part, as follows: "I have not formed an opinion regarding his capacity to conform his conduct, and the reason is that I wasn't asked to. I was asked to do this examination to fit the Illinois statute for insanity, and that does not include the phrase to conform his conduct to the law ***." The trial court overruled defense counsel's objections, and the State asked Dr. Chapman if he could form an opinion. He stated that "without the first prong, unable to appreciate the criminality, the second part is not applicable." After the court allowed him to finish his answer, Dr. Chapman stated: "It is my opinion that there is no mental condition that prevented him from appreciating the criminality. Therefore, there was nothing to prevent him from confronting [*sic*] his conduct, but that was not included in my report because that's not the statute." After the court overruled defense counsel's objections, the State asked Dr. Chapman for his opinion on defendant's ability to conform his conduct to the requirements of the law at the time of the offense. Dr. Chapman stated: "[T]here was no mental disease or defect that caused him to lack substantial capacity to appreciate the criminality of his conduct or to conform his conduct requirements, conduct to the requirements of the law." Defendant claims the court erred by overruling defense counsel's objections to this testimony. He argues an inadequate foundation existed for Dr. Chapman to give an opinion on involuntary intoxication.

> "Rebuttal evidence is evidence that explains, repels, contradicts[,] or disproves evidence presented by the other party. [Citation.] Whether to admit rebuttal evidence is a matter within the sound discretion of the trial court; and, on review, the court's decision to admit rebuttal evidence will not be disturbed absent a clear abuse of discretion. [Citation.] An abuse of discretion is shown only where the court's ruling is arbitrary, fanciful[,] or unreasonable, such that no reasonable person would take the view adopted by the trial court." *People v. Engle*, 351 Ill. App. 3d 284, 288, 813 N.E.2d 761, 765-66 (2004).

Defendant presented evidence on the issue of involuntary intoxication and whether he could appreciate the criminality of his conduct or conform his conduct to the requirements of the law. Thus, testimony given by Dr. Chapman to contradict or disprove that evidence was a proper subject for rebuttal.

Moreover, Dr. Chapman was qualified to give his opinion on whether defendant was involuntarily intoxicated at the time of the shootings. Dr. Chapman testified he became board certified in psychiatry in 1971 and forensic psychiatry in 1988. He reviewed doctor reports, witness statements, and investigative reports. During his

evaluation of defendant, Dr. Chapman found defendant had been prescribed the antidepressant Zoloft for his depression. Dr. Chapman's education and experience included pharmacology, and he testified to the use of Zoloft and its possible side effects. Dr. Chapman also reviewed the conclusions reached by Dr. Mitrione. Thus, Dr. Chapman had sufficient information allowing him to form an opinion on defendant's mental state.

Defendant's claim that Dr. Chapman's testimony was unreliable because he had originally been consulted to offer an opinion on sanity is also unavailing. See *People v. Seaman*, 203 Ill. App. 3d 871, 881, 561 N.E.2d 188, 195 (1990) (State psychiatry expert allowed to give opinion on the defendant's sanity even though the examination of the defendant was for the purpose of establishing fitness for trial). Dr. Chapman noted he was familiar with pharmacology, the study of the interaction of drugs with the body, and the side effects of Zoloft and indicated his evaluations include the possibility of mental disorders from toxic substances. Thus, the initial reason for his evaluation of defendant did not prohibit Dr. Chapman from forming an opinion on the question of involuntary intoxication. Further, any question arising from Dr. Chapman's initial reason for his evaluation and his opinion stated at trial would simply go to the weight of his testimony. See *Seaman*, 203 Ill. App. 3d at 881, 561 N.E.2d at 195 (questions concerning State expert's initial evaluation for fitness and opinion on sanity at trial would go to weight in comparison with opinion of defense expert on insanity).

Finally, even if we were to deem Dr. Chapman's rebuttal evidence improper, reversal is not required. As previously set forth, the State's evidence in its case in chief was sufficient to rebut defendant's involuntary-intoxication defense beyond a reasonable doubt. Defendant's actions before, during, and after the commission of the offense provided a sufficient basis for a rational trier of fact to return a guilty verdict.

Defendant also claims Dr. Chapman misled the jury by instructing it on the law of insanity in Illinois. We disagree. The trial court instructed the jury on the law applicable to this case, including an instruction on the definition of insanity. On review, a court "must presume, absent a showing to the contrary, that the jury followed the trial judge's instructions in reaching a verdict." *People v. Simms*, 192 Ill. 2d 348, 373, 736 N.E.2d 1092, 1112 (2000); see also *People v. Taylor*, 166 Ill. 2d 414, 438, 655 N.E.2d 901, 913 (1995) (jury is presumed to follow the instructions given by the court). As the jury here is presumed to have followed the instructions, and absent a showing to the contrary, we find no error or prejudice here.

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

KNECHT, J., concurs.

JUSTICE APPLETON, specially concurring:

I concur with the majority opinion but write separately for the sole purpose of distinguishing the proffered defense of involuntary intoxication from the defense of insanity. While there was ample evidence in the record upon which the jury could rely in overcoming the affirmative defense of involuntary intoxication, primarily the planning and execution of the crime, the testimony of the State's expert witness was irrelevant to that issue.

As the majority acknowledges, Dr. Chapman was called for the purpose of testifying to defendant's sanity. Neither insanity nor guilty but mentally ill was a proffered defense in this cause. To the extent Dr. Chapman testified concerning defendant's underlying mental capacity, his opinion is irrelevant. We must be clear, as the State apparently was not, that insanity and involuntary intoxication are wholly separate conditions involving completely different forms of analysis.