STATE of Wisconsin, Plaintiff-Respondent,

v.

David J. GARDNER, Defendant-Appellant.†

Court of Appeals

*No. 98–2655–CR. Submitted on briefs June 29, 1999.—Decided August 11, 1999.*

(Also reported in 601 N.W.2d 670.)

†Petition to review denied.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Steven P. Weiss*, assistant state public defender.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Sally L. Wellman*, assistant attorney general.

Before Brown, P.J., Anderson and Snyder, JJ.

BROWN, P.J.   David J. Gardner appeals from his conviction for armed burglary, false imprisonment while armed and second-degree sexual assault, claiming that the trial court erred in not allowing his expert to testify about his prescription medication's effect on his ability to distinguish right from wrong. We agree with Gardner that the involuntary intoxication defense is available when the intoxication was due to prescription medication taken as directed. However, our review of Gardner's offer of proof leads us to affirm the trial court's exclusion of the proffered testimony—Gardner's expert failed to assert that whatever intoxication there may have been affected Gardner's ability to tell right from wrong. Gardner also maintains that to sustain a conviction of armed burglary there must be some nexus between the weapon and the burglary other than the mere carrying of the weapon. *State v. Norris*, 214 Wis. 2d 25, 28–29, 571 N.W.2d 857, 858–59 (Ct. App. 1997), renders this argument futile. We affirm.

The case arises out of an incident between Gardner and his wife. Gardner's wife told him in August 1995 that she no longer wanted to be married to him. As their living situation became more strained, Gardner became depressed. Ultimately, he checked into a hospital for treatment. While there, he began taking the antidepressant paroxetine, commonly known as Paxil. Also while hospitalized, Gardner was served with a temporary restraining order prohibiting him from going to the marital home. Three days after his release, Gardner went to the home and entered the garage, carrying a large knife. He removed his wife's cellular phone from her car, disconnected the car battery and taped a screwdriver in the tracks of the garage door so that it could not open enough for the car to be driven out. Then he waited for his wife. When she opened the

door to the garage, Gardner took her upstairs to the bedroom where they had sexual intercourse. After a jury trial, Gardner was convicted of armed burglary, false imprisonment while armed and second-degree sexual assault.

Gardner challenges his conviction on three fronts. First, he claims expert testimony on the effects of Paxil should not have been excluded. Gardner claims that the testimony, had it been let in, would have formed the basis for a jury instruction on involuntary intoxication, which should have been given. Because the trial court never allowed Gardner's affirmative defense to be presented to the jury via a psychiatrist's testimony and a corresponding jury instruction, Gardner argues, the real controversy was not fully tried and we should grant a new trial in the interest of justice. Second, Gardner claims that the trial court should have given a lesser-included instruction on unarmed burglary since "[t]here was grave question as to the connection between the knife and the burglary." According to Gardner, "Due process of law and fundamental fairness demand that there be some nexus between the possession of a weapon and the commission of a burglary before a defendant can be convicted of the crime of armed burglary." Finally, Gardner asserts that his sentence should be substantially reduced. We address his various arguments as they are grouped above.

### Expert Psychiatric Testimony

At trial, Gardner sought to introduce the testimony of Dr. Herzl Spiro, a psychiatrist. The State brought a motion in limine to exclude Spiro's testimony, relying on *Steele v. State*, 97 Wis. 2d 72, 294 N.W.2d 2 (1980), for the proposition that psychiatric expert testimony may be excluded if offered to show

36

lack of capacity to form intent. The trial court, after hearing a lengthy offer of proof from Spiro, excluded the testimony for three reasons. First, the court found that there was not an adequate foundation for the testimony. Second, the court interpreted *State v. Flattum*, 122 Wis. 2d 282, 361 N.W.2d 705 (1985), as barring any expert testimony on intoxication if coupled with other factors. The court found that Spiro's proffered testimony would have incorporated "other influences . . . causing this problem." Third, the court found that the issues about which Spiro had offered testimony—consent and intent—would not be clarified for the jury by expert testimony. Rather, the jury could use its everyday experience to come to a conclusion regarding Gardner's intent and his wife's consent, and there was no need for the aid of expert testimony.

We agree with the trial court that Spiro's testimony was properly excluded, but only partially accept its reasoning. The trial court was correct in finding that a proper foundation for Spiro's testimony had not been laid. However, the trial court's reliance on *Flattum* was misplaced, as explained below.

Gardner sought to introduce Spiro's testimony in support of his defense of involuntary intoxication. In order to escape criminal responsibility under § 939.42(1), STATS., the defendant must show (1) that the intoxicated condition was involuntarily produced and (2) that the intoxication rendered the defendant incapable of distinguishing right from wrong. *See* § 939.42(1); *Loveday v. State*, 74 Wis. 2d 503, 508, 247 N.W.2d 116, 120 (1976). We note that this is not the same test as with voluntary intoxication; there, the intoxication must be such as to render the defendant incapable of forming the specific intent to commit the

crime. *See* § 939.42(2), STATS. The involuntary intoxication standard, rather than being congruent with the lack of specific intent standard for voluntary intoxication, is coextensive with the mental responsibility test set forth in § 971.15(1), STATS. *See* WIS J I—CRIMINAL 755, cmt. ("[I]n regard to the effect which involuntary intoxication must produce in order to be considered a defense, the same test applies as in the case of mental disease or deficiency as a defense.") (quoting 1953 Legislative Council Report on the Criminal Code).[1] We

---

[1] The Legislative Council Report discussed the revision of Wisconsin's criminal code. *See* Laws of 1953, ch. 623: Laws of 1955, ch. 696. The report was also included as comments in 1953 A.B. 100, A § 1. *See id.* at ii-iv. At the time of the Council's report, Wisconsin used the *M'Naghten* test for criminal insanity; that is, to be excused from responsibility the defendant must not have been able to distinguish right from wrong. *See State v. Esser*, 16 Wis. 2d 567, 572, 115 N.W.2d 505, 507–08 (1962) (declining to abandon *M'Naghten*); *see also* 1953 A.B. 100, A § 1 at 32 (proposing to codify *M'Naghten* test in criminal code revision); William A. Platz, *The Criminal Code*, 1956 WIS. L. REV. 350, 367 (noting that the *M'Naghten* test had been included in the 1953 draft of the criminal code revision but omitted in the enactment due to the advisory committee's disagreement about whether to adopt a new standard and its conclusion that the *M'Naghten* test would continue in force absent legislative change).

We acknowledge that Wisconsin has since abandoned *M'Naghten* in favor of the more modern MODEL PENAL CODE §§ 4.01 and 4.03 (1962). *See* Laws of 1969, ch. 255, § 63 (Note following text creating § 971.15, STATS.). The ALI test is broader than *M'Naghten* both because it permits a finding of insanity based upon inability to control one's conduct and because it allows the finding when the person's ability to recognize wrongfulness is substantially lowered rather than totally absent. *See Esser*, 16 Wis. 2d at 596, 115 N.W.2d at 520; *see also* Laura Reider, *Toward a New Test for the Insanity Defense: Incorporat-*

acknowledge that the two standards have been said to overlap considerably in the context of a bifurcated trial, *see Steele*, 97 Wis. 2d at 88, 294 N.W.2d at 9, but they are not the same. "[A] finding of legal insanity is not a finding of inability to intend; it is rather a finding that under the applicable standard or test, the defendant is to be excused from criminal responsibility for his [or her] acts." *Haas v. Abrahamson*, 910 F.2d 384, 395 (7th Cir. 1990) (quoted source omitted). Because the lack of capacity to form specific intent was not at issue in this case, *Steele* and *Flattum* are inapposite. *See Steele*, 97 Wis. 2d at 74, 294 N.W.2d at 2 (excluded expert testimony was on lack of capacity to intend to kill); *Flattum*, 122 Wis. 2d at 284, 361 N.W.2d at 707 (excluded expert testimony was on incapability of forming intent to kill).[2] Here, the issue was Gardner's ability to distinguish right from wrong, not his capacity to form intent. Thus, the trial court erred when it applied *Flattum*'s limitations to exclude Spiro's testimony.

The State argues that Spiro's testimony was properly excluded because the involuntary intoxication defense only applies to prescribed medication when the defendant did not know about the intoxicating effect of

*ing the Discoveries of Neuroscience into Moral and Legal Theories*, 46 UCLA L. REV. 289, 310–11 (1998) (reviewing various tests for insanity). However, the Judiciary Committee's comment that the standard is the same as for mental disease, along with the language of the statute itself, confirms our conclusion that the standard for involuntary intoxication is akin to that for mental responsibility under § 971.15.

[2] We note that Gardner argued that these cases were inapplicable and the State did not refute this in its brief. We address their applicability because the State relied upon them in its motion in limine and the trial court found *State v. Flattum*, 122 Wis. 2d 282, 361 N.W.2d 705 (1985), controlling.

the medication. Gardner made no such claim of ignorance here. Despite authority to the contrary, we are not persuaded that the defense should be so limited.

It is clear that the effects of prescription medication can form the basis of an involuntary intoxication defense. When commenting on the criminal code revision, the Legislative Council referred to an annotation discussing when the defense is available. *See* 1953 A.B. 100, A § 1 at 34. The cited annotation begins with the following quote:

> That if a person by the unskilfulness of his physician, or by the contrivance of his enemies, eat or drink such a thing as causeth such a temporary or permanent phrenzy . . . this puts him into the same condition, in reference to crimes, as any other phrenzy, and equally excuseth him.

Annotation, *When intoxication deemed involuntary so as to constitute a defense to criminal charge*, 30 A.L.R. 761, 761–62 (1924) (quoted source omitted). Modern authorities confirm that the defense is available for intoxication caused by prescription drugs. *See* 1 WAYNE R. LaFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 4.10(f), at 560 (1986) ("Yet another instance of involuntary intoxication is when the substance was taken pursuant to medical advice."). Under the Model Penal Code, intoxication is an affirmative defense when it is not self-induced and renders the actor incapable of appreciating the criminality of his or her conduct, or unable to conform his or her conduct to the law. *See* MODEL PENAL CODE § 2.08(4) (1962). An exclusion in the definition of "self-induced" demonstrates that prescription drug effects may count as involuntary intoxication:

(b) "self-induced intoxication" means intoxication caused by substances which the actor knowingly introduces into his body, the tendency of which to cause intoxication he knows or ought to know, *unless he introduces them pursuant to medical advice* or under such circumstances as would afford a defense to a charge of crime . . . .

*Id.* § 2.08(5)(b) (emphasis added). *See also* Phillip E. Hassman, *When Intoxication Deemed Involuntary so as to Constitute a Defense to Criminal Charge*, 73 A.L.R.3d 195 § 7 (1977) ("Intoxication prescribed or administered by physician").

The State acknowledges that the effects of prescription medication may constitute involuntary intoxication, but urges us to add the requirement that the defendant must not know of the intoxicating effect. We acknowledge that ample case law supports this position. The rationale is that if the defendant knows of the intoxicating effect prior to taking the medication, then the intoxication is rendered voluntary. *See City of Minneapolis v. Altimus*, 238 N.W.2d 851, 857 (Minn. 1976) (so holding and citing supporting cases). We see no reason to so limit the defense. Even if forewarned of the intoxicating effect of a prescription drug, a person should have recourse to the defense if the drug renders him or her unable to distinguish between right and wrong. When faced with a medical condition requiring drug treatment, the patient hardly has a choice but to follow the doctor's orders. Intoxication resulting from such compliance with a physician's advice should not be deemed voluntary just because the patient is aware of potential adverse side effects. We agree with the Texas courts' formulation of when the defense is available. "The involuntary intoxication defense is limited to (1) the defendant's unawareness of what the intoxi-

41

cating substance is; (2) force or duress; or (3) medically prescribed drugs *taken according to prescription."* *Shurbet v. State,* 652 S.W.2d 425, 428 (Tex. Ct. App. 1982) (emphasis added). We note that this does not include cases where a patient knowingly takes more than the prescribed dosage, *see Goldsmith v. State,* 252 S.E.2d 657 (Ga. Ct. App. 1979), or mixes a prescription medication with alcohol or other controlled substances, *see State v. Voorhees,* 596 N.W.2d 241 (Minn. 1999). Neither would the defense be available to one who voluntarily undertakes an activity incompatible with the drug's side effects. *See City of Wichita v. Hull,* 724 P.2d 699 (Kan. Ct. App. 1986) (holding that involuntary intoxication defense was properly denied where defendant drove after taking sleeping pill).

Despite our decision that the involuntary intoxication defense is available for the effects of medication taken as prescribed, we still conclude that the offer of proof warranted exclusion of the testimony. No evidence was presented concerning the duration of Paxil's effects. There was no testimony as to how much Paxil had been prescribed, save defense counsel's own assertion while questioning Spiro that he thought the dose "went to 20 milligrams the day of [Gardner's] release." Neither was there any evidence as to how much Paxil Gardner was actually taking. And even if there had been, Spiro testified that it was difficult to predict what the effect of a given dosage would be.

> Q: Do you know what, if any, amount of the drug the defendant had in him on October 2nd, 1995 in the morning hours?
>
> A: That's one of the problems with paroxetine, that because the blood level depends on the metabo-

lism of the drug in the liver and the coenzyme A . . . that particular enzyme varies enormously from person to person. When you give these drugs you never know what the blood level is. And it's one of the reasons there is so much variation in the doses required and so much variation in the response.

In short, Spiro's rambling testimony, replete with theories of what could have happened that day and results of studies concerning married couples' methods of signaling consent to sexual activity, did not even suggest that the amount of Paxil Gardner was taking could have rendered him incapable of distinguishing right from wrong. On the contrary, Spiro testified that "the guy basically thought what he did was wrong. He knows right from wrong."[3] Based on this offer of proof, the trial court properly excluded Spiro's testimony.

---

[3] The context of this portion of Spiro's testimony shows that it would not have supported the assertion that Gardner was unable to distinguish right from wrong. In discussing his decision to meet with Gardner, Spiro stated:

> And so on its surface it looked like is this a not guilty by reason of insanity? And frankly, I think I told you on the phone why waste your money on me? Because it was clear to me just from what you told me that the guy basically thought what he did was wrong. He knows right from wrong.
> . . . And the delusions were not of such force and conviction for me that I could tell you do this on an NGRI. And so I what I think I told you is I am real skeptical about this case. . . . It's not an NGRI.

Given the close relationship between the "lacked substantial capacity . . . to appreciate the wrongfulness of . . . conduct" and the *M'Naghten* right/wrong test, we are confident that Spiro was not saying, and would not have said, that Gardner could not distinguish right from wrong.

Gardner quotes the following passage in an attempt to convince us otherwise.

43

Because Gardner failed to present evidence that he was so intoxicated as to be unable to distinguish right from wrong, the court properly denied instructing the jury on the involuntary intoxication defense. Our supreme court examined when a defendant is entitled to a jury instruction on an intoxication defense in *State v. Strege*, 116 Wis. 2d 477, 343 N.W.2d 100 (1984). There, Strege had requested an instruction on voluntary intoxication. *See id.* at 481, 343 N.W.2d at 103. The supreme court concluded that "the evidence produced by the defendant did not warrant an instruction on the defense of voluntary intoxication." *Id.* at 486–87, 343 N.W.2d at 105.

> In order to place intoxication in issue in a given case, it will be necessary for the defendant to come forward with some evidence of his impaired condition. This evidence must be more than a mere statement that the defendant was intoxicated. The evidence must be credible and sufficient to warrant the jury's consideration of the issue as to whether the defendant was intoxicated to the extent it materially affected his or her ability to form the requisite intent.

Q: Now, by mental health history you included within that not only his major depression but also the fact that he was using—was under the influence of Paxil and thus would not be able to adequately assess whether it was right or wrong to enter his house despite [the restraining order]?

A: That's correct. I really was referring to all the technical professional aspects of this case where an expert witness may have a proper case in the courtroom, and not just to the common sense things that you don't need an expert to tell you about.

We read Spiro's answer as addressing the part of the question asking him about the bases for his conclusions, not the part referring to the right/wrong test.

44

*Id.* at 485–86, 343 N.W.2d at 105 (quoting *State v. Schulz*, 102 Wis. 2d 423, 430, 307 N.W.2d 151, 156 (1981)). Here, Gardner had to produce some evidence that his intoxication had affected his ability to distinguish right from wrong. *Compare* § 939.42(1), STATS. *with* § 939.42(2). He did not do so. The trial court was correct in concluding that "the offer of proof . . . didn't show that if there was an involuntary intoxication that it was to such an extent that it rendered the defendant incapable of differentiating right and wrong, which is . . . what the instruction says."

█ Because we conclude that Gardner's offer of proof was inadequate to place involuntary intoxication at issue in the case, we decline his invitation to grant a new trial in the interest of justice. The real controversy was fully tried.

### Nexus Between Weapon and Burglary

Gardner next challenges his conviction claiming that "due process of law and fundamental fairness demand" that there be some nexus between the commission of the underlying crime and the fact that the accused was carrying a weapon. The State responds that the nexus issue is controlled by *State v. Norris*, 214 Wis. 2d 25, 571 N.W.2d 857 (Ct. App. 1997). We agree.

*Norris* rejected the argument that a nexus between the burglary and the weapon is required under § 943.10(2)(b), STATS., which enhances the burglary penalty when the burglar arms himself or herself while committing a burglary. *See Norris*, 214 Wis. 2d at 28–29, 571 N.W.2d at 858–59. Norris based his argument on *State v. Peete*, 185 Wis. 2d 4, 517 N.W.2d 149 (1994), which held that "the State must prove that a

defendant possessed a weapon to facilitate commission of the predicate offense" in order for the general weapons penalty enhancer, § 939.63(1)(a), STATS., to apply. *Norris*, 214 Wis. 2d at 28, 571 N.W.2d at 858 (citing *Peete*, 185 Wis. 2d at 14, 517 N.W.2d at 150). This court explained the difference between the general weapon enhancer in *Peete* and the armed burglary statute, noting that the language in the armed burglary statute is "precise and plainly distinct" from that in the general enhancer. *See Norris*, 214 Wis. 2d at 28, 571 N.W.2d at 858. "The statute's language does not suggest a nexus requirement, but rather imposes a separate necessary element of the offense . . . ." *Id.* The court noted that such a construction was rational, as "[i]n a burglary, there is always an increased chance of danger where a person arms himself." *Id.* at 29, 571 N.W.2d at 858.

Gardner attempts to distinguish *Norris* on two grounds, neither of which we find persuasive. First, Gardner points out that while Norris entered a guilty plea, he took his case to the jury. This difference has no bearing on the presence or absence of a nexus requirement. Second, Gardner argues that the paragraph at issue here, containing the language "while armed," is closer to the "while possessing" language construed in *Peete* than the "arms himself" language in *Norris*. Gardner misunderstands the basis for *Norris's* departure from *Peete*. The nexus requirement in *Peete* was adopted, at least in part, to prevent the absurd result of applying the weapon enhancer to crimes for which having a weapon makes no difference at all. *See Norris*, 214 Wis. 2d at 28–29, 571 N.W.2d at 858 (citing *Peete* example of filling out a fraudulent tax return while possessing a weapon). For armed burglary, the possession of the weapon while burglarizing a home always has something to do with the crime. As noted above, the

presence of the weapon "enhances the prospect of danger." *Norris*, 214 Wis. 2d at 29, 571 N.W.2d at 858. And in cases such as the present, it magnifies the trauma for the victim. That *Norris* dealt with a different paragraph in the burglary statute is a distinction without a difference. *Norris* controls.

■

Gardner further argues that the penalty structure for armed burglary is constitutionally infirm because there is no rational basis for the thirty-year difference in potential penalties for armed versus unarmed burglary if there is no "meaningful difference in the acts constituting the crimes." First, the State asserts, and Gardner does not dispute, that this constitutional claim was never raised at trial. Therefore, it is waived. *See State v. Rogers*, 196 Wis. 2d 817, 826, 539 N.W.2d 897, 900 (Ct. App. 1995). And second, were we to address Gardner's due process/equal protection challenge we would give it short shrift. There certainly is a rational basis for a distinction between unarmed burglary and armed burglary: one involves a weapon and the other does not. The decision to punish an armed offense more stiffly than an unarmed, even when the arm is present but not used, is well within the legislature's broad power to enact laws to protect the public safety. *See State v. McManus*, 152 Wis. 2d 113, 130, 447 N.W.2d 654, 660 (1989). Gardner comes nowhere near clearing the high hurdle presented in challenging a statute's constitutionality. *See State v. LeQue*, 150 Wis. 2d 256, 266, 442 N.W.2d 494, 498–99 (Ct. App. 1989).

■

Gardner's final nexus argument is that because there was "grave question as to the connection between the knife and the burglary," the court should have given the instruction for the lesser-included offense of

unarmed burglary. A defendant is only entitled to an instruction on a lesser-included offense if there are reasonable grounds in the evidence to acquit on the greater charge and convict on the lesser. *See State v. Martin,* 156 Wis. 2d 399, 402, 456 N.W.2d 892, 894 (Ct. App. 1990), *aff'd,* 162 Wis. 2d 883, 470 N.W.2d 900 (1991). Here, Gardner admitted that he was carrying a ten- to twelve-inch knife when he committed the burglary. Thus, there were no reasonable grounds to acquit Gardner of armed burglary and convict him of burglary. The court correctly refused to give the lesser-included instruction.

*Reasonableness of Sentence*

Finally, Gardner claims that his sentence "should be substantially reduced, since no weapon was involved in the burglary in any way and because Gardner, a forty-eight-year-old first offender, was mentally ill and delusional at the time of these offenses."

Sentencing is within the broad discretion of the trial court and we will not overturn a sentencing decision unless there has been a clearly erroneous exercise of discretion. *See McCleary v. State,* 49 Wis. 2d 263, 277–78, 182 N.W.2d 512, 520 (1971). As long as there is evidence in the record that the trial court considered appropriate factors, this court will not second-guess a trial court's sentencing decision. *See id.* at 281, 182 N.W.2d at 521. The primary factors to be considered are the gravity of the offense, the character of the offender and the protection of the public. *See Elias v. State,* 93 Wis. 2d 278, 284, 286 N.W.2d 559, 561 (1980).

Here, the trial court spelled out its reasons for sentencing Gardner to thirty years in prison for the

armed burglary. The court considered the offense to be a serious one. It noted that Gardner entered his wife's home, while armed, despite a restraining order prohibiting him from going near her. Also significant in the trial court's eyes was the premeditation involved in the crime: Gardner brought a weapon with him from elsewhere, parked in another area so as not to be seen, jammed the garage door, took away his wife's cellular phone and disabled her car. The trial court expressed concern for the safety of Gardner's wife. And, we note the trial court did also consider the fact that Gardner was a first offender. However, this fact apparently did not impress the trial court when compared to the aggravated nature of the offense. All in all, the trial court considered the appropriate factors, and we will not disturb the sentence.

*By the Court.*—Judgment and order affirmed.