COURT OF APPEALS
DECISION
DATED AND FILED

June 25, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP1710-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2019CF1038

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

  PLAINTIFF-RESPONDENT,

 V.

CHAD CHRISTOPHER CARLSON,

  DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Rock County: JOHN M. WOOD, Judge. *Affirmed*.

Before Graham, P.J., Kloppenburg, and Taylor, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.  Chad Christopher Carlson appeals a judgment of conviction for incest with a child by a stepparent and third-degree sexual assault, and an order denying his motion for postconviction relief.  Carlson makes two arguments on appeal: first, that the circuit court erred by determining that the affirmative defense of involuntary intoxication was not available to Carlson because Carlson voluntarily consumed alcohol; and second, that the court erroneously exercised its discretion by denying his motion to withdraw his jury trial waiver.  We reject both of Carlson's arguments and affirm.

## BACKGROUND

¶2     In October 2019, the State filed a criminal complaint charging Carlson with one count of incest with a child by a stepparent and one count of third-degree sexual assault of his step-daughter, A.B.[1]  The circuit court rescheduled the trial date multiple times because of separate requests for adjournments by each party.

¶3     At the final pretrial conference in January 2022, the parties informed the circuit court that they had come to a plea agreement and requested a date for a plea hearing.  In order to schedule a plea hearing and remove the trial date from the calendar, the court required that Carlson waive his right to a jury trial, to which Carlson agreed.  The court conducted a jury trial waiver colloquy, during which Carlson indicated that he had kidney disease, he was on "heavy" medication, and he had taken a hydrocodone pill one hour before the hearing.  The court told

---

[1] Consistent with the policy of protecting victim privacy under WIS. STAT. RULE 809.86(4) (2023-24), we use initials that do not correspond to the victim's name.  All references to the Wisconsin Statutes are to the 2023-24 version.  We use actual names to refer to all other individuals including Carlson and members of law enforcement.

Carlson that it needed to "determine that you are understanding what we're talking about and that you're making a conscious, intelligent decision about waiving your constitutional right to a jury trial." Carlson said that he understood, and further expressed his understanding throughout the waiver colloquy. The court also told Carlson that if Carlson had "a change of heart" and no longer wanted to go through with a plea, "any trial in this case would be a trial to [the court]." Carlson again said that he understood. Carlson requested an opportunity to speak with counsel about the right he was waiving, which the court allowed before completing the waiver colloquy and accepting Carlson's waiver. The court scheduled a plea hearing for March 2022.

¶4 At the scheduled plea hearing in March 2022, Carlson informed the circuit court that he no longer wanted to accept the plea offer and wanted to proceed to trial. The court stated that "the only trial [Carlson]'s entitled to right now is a court trial in front of me" and scheduled a bench trial in July 2022, which was eventually adjourned at the request of the State to October 2022.

¶5 In September 2022, Carlson filed a motion to withdraw his jury trial waiver, asserting that because he was on pain medication at the time, he did not fully consider and appreciate the constitutional rights that he was giving up, and that granting his request would not substantially delay or impede the cause of justice. After holding a hearing on the motion during which the court received statements from the victim and the victim's mother and heard arguments by the parties, the court denied Carlson's motion to withdraw his jury trial waiver. Additional details regarding the motion and hearing will be provided in the discussion that follows.

¶6      The one-day bench trial commenced in October 2022, during which the following facts were established through testimony and evidence of an audio recording and transcript of an interview Rock County Sheriff's Deputy Zachary Anacker conducted with Carlson in the early morning following the crimes.

¶7      Carlson shared a house with A.B.'s mother.  In the four days preceding the crimes, Carlson was sick with the stomach flu, and experienced vomiting and diarrhea.  He could not eat or keep water down.

¶8      On the second day of Carlson's illness, he went to a scheduled annual physical with his primary physician.  Carlson requested, and received, a prescription for Chantix, a medication to assist him in his attempts to quit smoking cigarettes, which Carlson had used in the past.  Carlson also spoke with his physician about Metoprolol, a prescribed medication Carlson took for a heart condition.

¶9      Carlson continued to experience flu-like symptoms, and sought medical care on Wednesday.  He was diagnosed with the stomach flu and given anti-nausea medication.  By Thursday, the day of the crimes, Carlson felt better but was still home from work and ate little.

¶10      After completing some yard work on Thursday morning, around 11:30, Carlson went to the basement of his house where he did laundry, watched television, and drank alcohol.  Carlson had not consumed much food since Sunday night.  He drank all of the beer that he had, which was four cans.  When the beer was finished, Carlson did not want to drive a vehicle to purchase more beer, and he switched to drinking mixed drinks.  Carlson told Deputy Anacker that he

estimated that he drank between three and five mixed drinks.[2] Carlson dozed off and had a sexual dream about his wife.

¶11    Meanwhile, A.B. had come over to the house and was in her room. When Carlson woke up from dozing in the basement around 5:00 p.m., he felt like he "was in a cloud." He went upstairs and entered A.B.'s room. While kneeling beside her bed and conversing with her, Carlson touched A.B.'s breasts and vagina, and claimed that while doing so he hallucinated that A.B. was his wife.

¶12    Carlson went outside, and A.B. texted her sister that "Chad had gone too far," and asked that their father pick A.B. up or that her sister call the police. Carlson eventually returned to A.B.'s room and apologized. He told A.B. that he did not know what he was doing and that he had been drinking. A.B. told him that her father was coming to pick her up and walked out of the room. Soon after, A.B.'s mother, who had been sleeping in the primary bedroom due to her third shift work hours, awoke, and Carlson told her what had occurred.

¶13    Early the next morning, A.B.'s mother called the Rock County Sheriff's Department. Carlson was cooperative and agreed that police should be called. Both Carlson and A.B. were interviewed by Deputy Anacker. In his interview, Carlson denied ever previously engaging in "this type of behavior" with A.B. In A.B.'s interview and in her trial testimony, she described a pattern of behavior from Carlson beginning when she was twelve or thirteen years old that

---

[2] At trial, Carlson testified that he did not remember the number of mixed drinks he consumed during the afternoon before the crimes. In his postconviction submissions to the court, Carlson's expert estimates that Carlson consumed one mixed drink during the afternoon preceding the crimes in support of the conclusion that given Carlson's height and weight, he was not intoxicated from the alcohol at the time of the crimes, but from the Chantix. However, this assertion that Carlson consumed one mixed drink has no factual support in the record before us.

involved Carlson touching her in ways that made her uncomfortable. In his trial testimony, Carlson denied touching A.B. in a sexual manner previously, and he could not remember whether he had put his fingers inside of A.B.'s swim suit on one occasion as A.B. described.

¶14 During Carlson's trial testimony, the State objected to a line of questioning regarding Carlson's use of Chantix, the daily prescription medication Carlson began taking for assistance in quitting smoking cigarettes, on the Monday before the crimes. Carlson had indicated in pretrial filings that at trial he would introduce expert testimony that the effects of taking Chantix rendered Carlson involuntarily intoxicated pursuant to WIS. STAT. § 939.42 such that he was unable "to tell whether his acts were right or wrong at the time the acts [were] committed."

¶15 The State argued that questions pertaining to Carlson's Chantix use were irrelevant because the involuntary intoxication defense was not available to Carlson given the uncontroverted evidence that Carlson had consumed a large amount of alcohol along with his prescribed doses of Chantix during the day of the crimes. The circuit court sustained the State's objection to the testimony after explaining that it had considered the issue by reviewing Carlson's pretrial filings, examining the language of the involuntary intoxication statute, and researching and reviewing applicable case law, all of which led the court to conclude that Carlson's voluntary use of alcohol, in combination with Chantix, rendered the involuntary intoxication defense unavailable to Carlson. Therefore, the court concluded that evidence supporting an involuntary intoxication defense was irrelevant. The court's decision also resulted in Carlson not being able to call his expert witness on the issue of the effect that Chantix might have had on Carlson's ability to determine right from wrong during the incident.

¶16 The circuit court found Carlson guilty of both criminal counts and entered a judgment of conviction.

¶17 In May 2024, Carlson filed a motion for postconviction relief requesting a new trial, arguing that the circuit court erred by prohibiting Carlson "from introducing evidence supporting the statutory defense of involuntary intoxication … solely because Carlson had consumed alcohol while also taking the antismoking medication that Carlson asserted caused him to hallucinate … at the time of the incident." Pertinent here, Carlson asserted that the court's decision that the involuntary intoxication defense was not available to him "was premised on an overly narrow reading of dicta in *State v. Gardner*, 230 Wis. 2d 32, 601 N.W.2d 670 (Ct. App. 1999)." Rather, Carlson argued that "implicit in the *Gardner* court's later observation that the involuntary intoxication defense is not 'available' when a [prescription] medication is mixed with 'alcohol or another controlled substance,' is that the consumption of the alcohol or other controlled substance is contrary to medical advice."

¶18 In support of the motion, Carlson filed two reports by his proposed expert witness regarding the effects of Chantix and the potential effects on Carlson. The reports indicate that Carlson was warned by the prescribing physician and the dispensing pharmacist to limit his consumption of alcohol, but that there was no warning on the Chantix label to refrain from consuming alcohol while taking the medication. The lack of a warning on the label was consistent with FDA-approved prescribing protocols for Chantix. Therefore, Carlson argued that because he was never warned to abstain from alcohol use when taking Chantix, he was using the medication consistent with medical advice and should have been allowed to introduce evidence to support an involuntary intoxication defense.

¶19 The circuit court reviewed the parties' submitted materials on the issue and allowed counsel to make additional legal arguments before the court issued an oral ruling denying the motion. The court explained that, as it had concluded at trial, *Gardner* precludes Carlson's use of the involuntary intoxication defense due to Carlson's voluntary consumption of alcohol. The court entered a written order consistent with the oral ruling. Carlson appeals the judgment of conviction and the postconviction order.

## DISCUSSION

¶20 As noted, Carlson makes two arguments on appeal. First, he renews his arguments at trial and in his postconviction motion that the circuit court erred by prohibiting him from introducing evidence to support the affirmative defense of involuntary intoxication. Second, he argues that the court erroneously exercised its discretion when it prohibited him from withdrawing his jury trial waiver. We address these arguments in turn.

### I. Involuntary Intoxication Defense

¶21 Carlson argues that the circuit court erred by prohibiting him from introducing evidence in support of the affirmative defense of involuntary intoxication set forth in Wis. Stat. § 939.42, based on what he argues was the court's erroneous interpretation of the availability of that defense as explained in *Gardner*. Specifically, Carlson argues that *Gardner*'s implicit conclusion is that the consumption of alcohol automatically precludes an involuntary intoxication defense only when the consumption of alcohol is contrary to medical advice. Therefore, Carlson asserts that because he used Chantix as prescribed, he should have been entitled to introduce evidence in support of an involuntary intoxication defense.

8

¶22 The decision of whether to admit evidence is committed to the discretion of the circuit court. *State v. Jones*, 2018 WI 44, ¶27, 381 Wis. 2d 284, 911 N.W.2d 97. "A circuit court properly exercises its discretion when it considers the relevant facts, applies the correct law, and articulates a reasonable basis for its decision." *Id.* (citation omitted). Conversely, the court erroneously exercises its discretion when it bases its decision on "an erroneous view of the law." *State v. City of La Crosse*, 120 Wis. 2d 263, 268, 354 N.W.2d 738 (Ct. App. 1984). Whether a crime is subject to a privilege defense and the scope of such a defense if it exists, present questions of law that we review de novo. *State v. Dundon*, 226 Wis. 2d 654, 662, 594 N.W.2d 780 (1999).

¶23 The circuit court excluded evidence regarding the effects of Chantix because it determined that such evidence was irrelevant—as the court explained, case law makes clear that the involuntary intoxication defense was not available to Carlson due to his consumption of alcohol. Accordingly, we independently consider whether the involuntary intoxication defense was available to Carlson based on the pertinent undisputed facts of this case. We conclude, for the following reasons, that as a matter of law, the involuntary intoxication defense was not available to Carlson because he voluntarily consumed a significant quantity of alcohol in addition to taking Chantix prior to the crimes. Therefore, the court did not erroneously exercise its discretion in excluding testimony in support of the involuntary intoxication defense.

¶24 The affirmative defense of involuntary intoxication is set forth in WIS. STAT. § 939.42:

> An intoxicated or a drugged condition of the actor is a defense only if such condition is involuntarily produced and does one of the following: (1) Renders the actor incapable of distinguishing between right and wrong in

9

regard to the alleged criminal act at the time the act is committed[; or] (2) Negates the existence of a state of mind essential to the crime.

The effect of a prescription medication can form the basis for an involuntary intoxication defense, but only under specific circumstances. *Gardner*, 230 Wis. 2d at 40. Pertinent here, the involuntary intoxication defense is not available when a person voluntarily "mixes a prescription medication with alcohol or other controlled substances" because the voluntary nature of doing so cannot be reconciled with the requirement of involuntary intoxication in asserting the defense. *Id.* at 42.

¶25 Here, the undisputed facts establish that, on the day of the crime, Carlson took two doses of Chantix, as prescribed, in addition to prescription medication for his heart and anti-nausea medication. That afternoon, Carlson consumed four beers and estimated to Deputy Anacker that he consumed between three and five mixed drinks. Carlson's consumption of alcohol followed Carlson experiencing four days of stomach flu accompanied by persistent vomiting and diarrhea that rendered Carlson unable to work or eat.

¶26 Carlson argues that the "overall structure and logic" as well as the "immediate language surrounding" the prohibition on alcohol consumption in *Gardner* show that this court "implied" that the mixing of alcohol with a prescription medication must be contrary to medical advice. We are not persuaded.

¶27 For context, we reproduce the quote from *Gardner* with the surrounding language:

> When faced with a medical condition requiring drug treatment, the patient hardly has a choice but to follow the doctor's orders. Intoxication resulting from such

> compliance with a physician's advice should not be deemed voluntary just because the patient is aware of potential adverse side effects. We agree with the Texas courts' formulation of when the defense is available. "The involuntary intoxication defense is limited to (1) the defendant's unawareness of what the intoxicating substance is; (2) force or duress; or (3) medically prescribed drugs *taken according to prescription*." ***Shurbet v. State***, 652 S.W.2d 425, 428 (Tex. Ct. App. 1982) (emphasis added). We note that this does not include cases where a patient knowingly takes more than the prescribed dosage, *see* ***Goldsmith v. State***, 148 Ga. App. 786, 252 S.E.2d 657 (1979), or mixes a prescription medication with alcohol or other controlled substances, *see* ***State v. Voorhees***, 596 N.W.2d 241 (Minn. 1999). Neither would the defense be available to one who voluntarily undertakes an activity incompatible with the drug's side effects. *See* ***City of Wichita v. Hull***, 11 Kan. App. 2d 441, 724 P.2d 699 (1986) (holding that involuntary intoxication defense was properly denied where defendant drove after taking sleeping pill).

*Gardner*, 230 Wis. 2d at 41-42.

¶28 While this paragraph does discuss the availability of the involuntary intoxication defense for a person taking prescription medication according to medical advice, the language barring the use of the defense when alcohol is also consumed has no such limitations. Carlson argues that it "would make no sense" and "would lead to absurd results" if we interpreted the language making the defense unavailable when the defendant combines his prescription medication with alcohol even when alcohol use is not contrary to medical advice. We reject this proposition because this court and our supreme court have made clear that the involuntary intoxication defense is not available to a defendant who voluntarily consumes alcohol with prescription medication.

¶29 In *Anderson*, our supreme court considered whether a defendant could base an insanity defense on the use of prescription medication as allowed in an involuntary intoxication defense. ***State v. Anderson***, 2014 WI 93, ¶¶17-35, 357

11

Wis. 2d 337, 851 N.W.2d 760.  In concluding that there was no basis in law to apply such an exception in the insanity defense context, the court extensively discusses the involuntary intoxication defense pursuant to WIS. STAT. § 939.42. *Anderson*, 357 Wis. 2d 337, ¶¶22-23, 25, 28-35.  The court states that if

> the rationale in *Gardner*—which holds prescription drugs can form the basis of an involuntary intoxication defense—is also applicable to an insanity defense, any limitations to that defense would apply with equal force to this case. And, as the court of appeals explained in *Gardner*, one who "mixes a prescription medication with alcohol or other controlled substances" is not eligible for the involuntary intoxication defense.

*Id.*, ¶33.  The court determined that *Gardner*'s reasoning on this issue "is in keeping with the generally accepted principle that an individual is responsible for the consequences that result from voluntary consumption of mind-altering substances," *id.*, ¶34, and "it is established law that one who mixes prescription medication with alcohol is responsible for any resulting mental state," *id.*, ¶36. The court also cited *Godfrey* for the proposition that "[a] person who consumes an intoxicant along with medication[] does so at his own peril."  *City of Waukesha v. Godfrey*, 41 Wis. 2d 401, 406, 164 N.W.2d 314 (1969).

¶30     This court "may not dismiss a statement from an opinion by [our supreme] court by concluding that it is dictum."  *Zarder v. Humana Ins. Co.*, 2010 WI 35, ¶58, 324 Wis. 2d 325, 782 N.W.2d 682.

¶31     Moreover, the expert reports submitted by Carlson in support of his postconviction motion reinforce the logic of the above statements from *Anderson* and *Godfrey*.  The reports state that Carlson's "visual hallucinations" on the day of the crimes were caused by Chantix and "exacerbated by the concomitant use of alcohol."  One of the reports states that Carlson had been warned by both the

prescribing physician and the dispensing pharmacist to limit his use of alcohol. This warning went unheeded by Carlson given his statements to Deputy Anacker that Carlson had consumed between seven and nine alcoholic drinks on the afternoon of the crimes after suffering from the stomach flu during the four previous days and consuming little food. In Carlson's statement to law enforcement about the crimes, Carlson admitted that he had a "good buzz going" when he entered A.B.'s bedroom, and he blamed his behavior on alcohol (rather than the effects of Chantix) when he apologized to A.B.

¶32 Accordingly, we reject Carlson's argument that the circuit court erred as a matter of law when it determined that the involuntary intoxication defense was not available to Carlson.[3] Therefore, the court did not erroneously exercise its discretion when it excluded evidence in support of this defense.

## II. Withdrawal of Jury Trial Waiver

¶33 Carlson argues that the circuit court erroneously exercised its discretion when it refused to allow him to withdraw his jury trial waiver. This court reviews a circuit court's denial of a defendant's motion to withdraw a valid jury trial waiver for an erroneous exercise of discretion. *State v. Cloud*, 133

---

[3] Because our conclusion on this issue is dispositive, we do not address Carlson's argument that he met the "some evidence" burden of production required to assert the affirmative defense of involuntary intoxication. *See Barrows v. American Fam. Ins. Co.*, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").

We also do not address Carlson's argument that the language in *State v. Gardner*, 230 Wis. 2d 32, 601 N.W.2d 670 (Ct. App. 1999), should be "clarified," because, as Carlson acknowledges, only our supreme court possesses such authority. *See Cook v. Cook*, 208 Wis. 2d 166, 189-90, 560 N.W.2d 246 (1997) ("[O]nly the supreme court … has the power to overrule, modify or withdraw language from a published opinion of the court of appeals.").

Wis. 2d 58, 63, 393 N.W.2d 123 (Ct. App. 1986). As stated, "[a] circuit court properly exercises its discretion when it considers the relevant facts, applies the correct law, and articulates a reasonable basis for its decision." *Jones*, 381 Wis. 2d 284, ¶27 (citation omitted).

¶34 The circuit court should exercise its discretion "liberally in favor of granting the defendant's right to a jury trial." *Cloud*, 133 Wis. 2d at 63. The court "must balance the legitimate interests of the court and prosecutor with the defendant's fundamental interest in the right to a trial by jury." *Id.* at 64. The court should consider "the defendant's reason for requesting withdrawal, the timing of the request, relevant changes of circumstances, and the delay, inconvenience, or other adverse consequences of allowing withdrawal." *Id.* at 63-64. In addition, the court erroneously exercises its discretion when it denies a motion to withdraw a jury trial waiver "if there is no showing that granting withdrawal would have substantially delayed or impeded the cause of justice." *Id.* at 65.

¶35 We now provide additional relevant facts regarding Carlson's motion to withdraw his jury trial waiver.

¶36 In his motion, Carlson argued that he did not "fully consider and appreciate the constitutional right that he was giving up" when he waived his right to a jury trial because he was experiencing pain and taking pain medication at the time. Carlson also argued that, even if his waiver was proper, the circuit court should allow him to withdraw his waiver because "granting his request will not substantially delay or impede the cause of justice." In an affidavit filed in support of his motion, Carlson averred, in pertinent part, that during the hearing at which he waived his right to a jury trial, his "mind was clouded from the pain and the

14

medication; [and he] was unable to focus on what was being said to [him] about waiver of [a] jury [trial] and to understand the impact of that decision."

¶37    The circuit court held a hearing on Carlson's motion in September 2022.  The victim and the victim's mother made statements to the court regarding their concern about how the withdrawal of Carlson's jury trial waiver "might further delay the process and our healing process," as well as the "difficult[y]" and "trauma" they would suffer as a result of changing the trial from a bench trial to a jury trial.  Carlson and the State made oral arguments, and the court proceeded to make an oral ruling.

¶38    The circuit court first addressed the factors set forth in *Cloud* as follows.  The court explained that Carlson's reason for requesting the jury trial waiver withdrawal was "nothing more than a change of heart" that did not weigh in favor of granting the motion.  *See Cloud*, 133 Wis. 2d at 63 (courts should consider reason for requesting withdrawal).  The court next noted that the request came "approximately 30 days prior to the [c]ourt trial" and that it had not presented any relevant change of circumstances that supported the waiver withdrawal.  *See id.* at 63 (courts should consider timing of request and relevant changes of circumstances).

¶39    The circuit court then turned to "the delay, inconvenience, or other adverse consequences of allowing th[e] withdrawal," *id.* at 64, and explained that it was "keenly sensitive to the delay that this is going to cause if this motion were to be granted and obviously the impact to and inconvenience to the victims and witnesses."  The court determined that there would be no prejudice to the State if it granted the motion.  Finally, the court considered whether withdrawal would cause any interference with the orderly administration of justice.  On this point, the court

15

stated: "we have been coming out of a pandemic and we have been holding jury trials like crazy, … and it has been complicated to try to work through our backlogs and try to get cases on for jury trials and court trials so we can proceed with the criminal justice system with an orderly administration of justice."

¶40    After attempting unsuccessfully to fit in a jury trial during the week that the bench trial was scheduled, the circuit court concluded that the decision on Carlson's motion to withdraw his jury trial waiver "really does boil down to whether or not further delay to reschedule a jury trial would impede the cause of justice, and I'm finding that it certainly would in this case given that we've had this case scheduled multiple times for trial without the ability to get it resolved for one reason or another."  The court specifically noted speedy trial demands in other cases on its calendar and the prosecutor's calendar.  Accordingly, the court denied Carlson's motion to withdraw his jury trial waiver.

¶41    We conclude that the circuit court did not erroneously exercise its discretion in denying Carlson's motion to withdraw his jury trial waiver.  The court properly considered "the defendant's reason for requesting withdrawal, the timing of the request, relevant changes of circumstances, and the delay, inconvenience, or other adverse consequences of allowing withdrawal."  *Cloud*, 133 Wis. 2d at 63-64.  The court also specifically considered the expressed preferences of the victim for timely disposition of the case, a right enshrined in WIS. CONST. art. I, § 9m.  The court reasonably concluded that, given what it described as the complicated nature of scheduling trials as courts re-opened after the COVID-19 pandemic to a flood of delayed jury trials, as well as the inability to schedule a jury trial at which the prosecutor could be present in the weeks following the scheduled bench trial, allowing Carlson to withdraw his jury trial waiver would impede the cause of justice.

16

¶42 Carlson argues that the circuit court erroneously exercised its discretion because it did not specifically determine the length of the delay that would be caused by the jury trial waiver withdrawal. While the court did not explicitly state that allowing Carlson to withdraw his waiver would "*substantially* delay" the trial, *see Cloud*, 133 Wis. 2d at 65 (emphasis added), we conclude that this determination was implicit in the court's discussion of the negative impacts the waiver withdrawal would have on the victim and the delay that would be caused in part due to the large backlog of cases for trial caused by pandemic closures. We further note that "substantially" is not defined in *Cloud* or subsequent case law, and that the court could have reasonably concluded that any additional delay, given the nearly three years that had elapsed since the date of the crimes, would substantially delay justice for the victim, as she expressed in her statement opposing Carlson's withdrawal of his jury trial waiver.

¶43 Carlson also asserts that the circuit court erroneously exercised its discretion when it concluded that Carlson's "change of heart" was an improper reason for withdrawal. This misrepresents the court's statement: the court merely explained that it did not consider the "change of heart" reasoning as a factor weighing in favor of granting Carlson's motion. Carlson does not cite legal authority in support of his proposition that this was an erroneous exercise of discretion, and we reject the assertion on that basis. *See Industrial Risk Insurers v. American Eng'g Testing, Inc.*, 2009 WI App 62, ¶25, 318 Wis. 2d 148, 769 N.W.2d 82 ("Arguments unsupported by legal authority will not be considered[.]").

¶44 Carlson next argues that the circuit court did not account for the change in circumstances between the date Carlson waived his right to a jury trial, when he was experiencing pain from kidney stones and planned to take a plea, and

the date Carlson moved to withdraw his waiver, when he was scheduled to go to trial. The court reasonably concluded that this was not a significant change in circumstances that outweighed the delay in the cause of justice, especially because Carlson was aware that he was going to trial in fall 2022 back in March 2022, yet he did not move for withdrawal of his jury trial waiver until approximately one month before the scheduled bench trial.

¶45 Finally, Carlson argues that the circuit court's comments at the hearing at which Carlson waived his right to a jury trial "suggested that it was enforcing the waiver as a matter of policy, which is antithetical to an exercise of discretion." We disagree that any such comments at the jury trial waiver hearing rendered the court's denial of Carlson's motion for withdrawal erroneous. As explained above, the court considered the factors set forth in *Cloud* and determined that, on the specific facts of this case, allowing Carlson to withdraw his waiver would impede and delay the cause of justice and interfere with its orderly administration.

¶46 In sum on this issue, we conclude that the circuit court did not erroneously exercise its discretion in denying Carlson's motion to withdraw his jury trial waiver.

## CONCLUSION

¶47 For the reasons set forth above, we affirm.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.